John Dubois, lessee of Oliver S. Wolcott, plaintiff in error v. Andrew D. Hepburn.

Construction of the fourth section of the act of assembly of Pennsylvania, passed 15th March 1815, providing for the sale of lands for taxes.

The law of Pennsylvania, authorizing the redemption of lands sold for taxes, ought to receive a liberal and benign construction in favor of those whose estates will be otherwise divested; especially where the time allowed is short, an ample indemnity given to the purchaser, and a penalty is imposed on the owner. The purchaser suffers no loss; he buys with full knowledge that his title cannot be absolute for two years; if it is defeated by redemption, it reverts to the lawful proprietors.

It would seem not to be necessary for the purposes of justice, or to effectuate the objects of the law, that the right to redeem should be narrowed down by a strict construction.

It comports with the words and spirit of the law, to consider any person who has an interest in lands sold for taxes, as the owner thereof, for the purposes of redemption.

Any right, which in law or equity amounts to an ownership in the land; any right of entry upon it, to its possession, or enjoyment, or any part of it, which can be deemed an estate in it; makes the person the owner, so far as it is necessary to give him the right to redeem.

The law does not require a payment or tender; an *offer* and *refusal* is made equivalent to a receipt of the money by the treasurer; and authorizes a recovery of the land by suit, as if no sale had been made.

VOL. X.—A.

ERROR to the circuit court of the United States for the western district of Pennsylvania.

The plaintiff in error instituted an ejectment for a tract of land situated in Lycoming county, in the State of Pennsylvania; and exhibited a title, regularly deduced, under a patent granted to Joseph Fearon, dated 19th September 1796.

The title claimed by the defendant was derived from a purchase at a sale of the land made by the treasurer of the county of Lycoming, on the 12th of June 1826, for county and road taxes, regularly assessed on the same; the county taxes prior to the 1st of February 1825, and the road taxes on the 22d April 1825. The whole of the land in controversy was sold for five dollars and fifty-two and a half cents, the alleged amount of the taxes and costs. On the 15th July 1826, the treasurer of the county conveyed the premises to the defendant.

It appeared in evidence that the heirs and legal representatives of Joseph Fearon, the patentee of the land in controversy, were the children of Abel Fearon and Robert Fearon, and the brothers of Joseph Fearon; both brothers having died in the life-time of the patentee: and on the 26th March 1825, partition of the real estate of Joseph Fearon was made between the two branches of the Fearon family, by which the premises in this ejectment were, inter alia, allotted to the heirs of Abel Fearon, in consideration of a moiety of the lands of the intestate having been allotted to the heirs of William Fearon. On the 27th March 1827, partition of the portion of the real estate allotted to the heirs of Abel Fearon; and the tract of land in controversy, became the property, by this partition, of Jacob Fox and wife, late Elizabeth Fearon, from whom the plaintiff in the ejectment held, by intermediate conveyances, the premises in controversy, in fee simple.

The plaintiff, in order to overthrow the alleged tax title, set up by the defendant, gave in evidence an alleged redemption of the said tract, No. 5615, by a tender, both to the county treasurer and the defendant, within two years after the said sale, of the full amount of the said taxes, and costs, and twenty-five per centum upon the aggregate amount thereof, as called for by law.

[Dubois v. Hepburn.]

The case came on for trial by a jury, at January term 1833, and the plaintiff's counsel requested the court to instruct the jury—

1st. That under the act directing the mode of selling unseated lands for taxes, and its several amendments and supplements, any person may legally pay the taxes due-on such land.

2d. That any man who may legally pay such taxes, may legally redeem such land sold for taxes, within the term specified in said acts.

3. That any person has a right to redeem such land so sold, by a payment of the tax, costs, and per centage, within the time named in the said acts.

4. That any person having or believing himself to have an interest in the lands so sold, has a right to redeem the same within the period named in the said act.

5. That any person connected by blood, or by title, with the owner or supposed owner of the lands so sold, has a right so to redeem the same.

6. That any person having the charge of such lands from the owner, during his life, after his decease intestate, and without a countermand of such charge, has a right to redeem such lands so sold.

7. That the treasurer under the said acts is an officer ministerial, and not judicial, and that he is bound to receive, under the above acts, the redemption money for the land so sold, under the facts severally above set forth.

8. That the treasurer has no authority to decide in whom the title or ownership of such lands so sold and offered to be redeemed, is vested.

9. That the refusal of said treasurer to receive the redemption-money for lands so sold, is equivalent to, and dispenses with a tender of the same.

10. That if the plaintiff, Oliver S. Wolcott, and the defendant, Andrew D. Hepburn, were citizens of different states at the time of the action brought, that is to say, that Andrew D. Hepburn was a citizen of Pennsylvania, and Oliver S. Wolcott was a citizen of Connecticut, or of any other State of the United States, the jurisdiction of this court attached; and that such ju-

[Dubois v. Hepburn.]

risdiction was not divested by any change of citizenship or do-
micil by the said Oliver S. Wolcott, after the institution of this suit.

11. That a citizen of the United States, born in the State of
Connecticut, who resided until his marriage and settled there
upon his marriage, gained thereby a citizenship and domicil by
origin ; which is not divested or changed unless there be proved
a citizenship and domicil acquired by the said Oliver S. Wolcott
elsewhere, in some other State or jurisdiction.

12. That any person holding an interest in land as tenant in
common, on which taxes have been previously assessed and are
unpaid, has a right to redeem the said land from a sale for said
taxes, within two years thereafter, although he has been divested
of his interest in said land by a partition after said assessment,
and before the sale for taxes.

The court, on the points presented by the counsel for the
plaintiff, gave the following answers :

1. The law is as here stated. Any person may legally pay
the taxes assessed on unseated lands, under the several acts of
assembly of this commonwealth directing the mode of selling
unseated lands for taxes.

2 and 3. But no one has a right to redeem such land so sold,
but the owner or owners, his, her, or their agent or attorney.

4. Any person having an interest in land so sold, has a right
to redeem the same within the period named in the said act, but
a mere opinion without right of having an interest, confers no
power to redeem.

5. Any person connected by title with the owner, or supposed
owner of the land so sold, has a right to redeem the same, but
the right does *not* exist in a relation by blood because of that
relationship.

6. The decease of a person intestate being the owner of such
lands is a revocation of the authority of one who had the charge
of them from the deceased; yet, under some circumstances, he
may redeem lands so sold which were under his charge, not-
withstanding the decease of the owner intestate. But where the
owner was of full age, and had actual notice, as in this case, from
the county treasurer of the sale of the land for taxes, and of the

name of the purchaser, and of the time within which he had power to redeem, and disavows any agency, and declares he will incur all risque, the interference of another person to redeem, not asserting any authority from the owner to do so, would not affect the title of the purchaser of land so sold.

7 and 8. It is true that the treasurer, under the acts referred to, is a ministerial and not a judicial officer, but the said acts did not bind him to receive the redemption money for the land so sold under the facts severally above set forth. The decision of the county treasurer cannot affect the legal rights, either of the owner or purchaser, and he has no authority to determine in whom the title or ownership of such land so sold and offered to be redeemed is vested. But before he receives the redemption-money it is his duty to satisfy himself that the person tendering it is either owner, or agent, or attorney for the owner.

9. If lands are so sold and a county treasurer refuse to receive the redemption-money from a person duly authorized to tender it, it is not necessary to make an actual tender of it.

10 and 11. In substance these instructions have already been given to the jury, but I repeat them in the language of the plaintiff's counsel.

12. The court instruct you on this point as requested by the plaintiff's counsel. Its application, however, to the case before you must be tested by the facts connected with it and given in evidence. The county tax, for which in part the land in question was sold, was assessed prior to the 26th of March 1825, the date of the deed of partition to which Robert Quay is a party. But it appears, from the certificate of the supervisor of roads, that the assessment of the road tax on the land in dispute was made the 22d of April 1825, and filed in the proper office the 3d of May following, after Robert Quay and wife had parted with all their interest in the land. And by the act of assembly for the sale of unseated lands for taxes, unseated land may be sold for *any part* of the taxes due. This land being, therefore, sold for the arrearage of tax as well as for the assessment made before the execution of the deed of partition, Robert Quay could have no legal right derived from his having been once part owner of it, to tender *all* the taxes due for the purpose of redemption.

[Dubois v. Hepburn.]

The defendant's counsel requested the court to instruct the jury as follows:

1. That if, from the testimony disclosed, they believe that Oliver S. Wolcott was not a citizen of the State of Connecticut on the 22d September 1830, but had lost his domicil then, the plaintiff cannot recover.

2. That from the testimony disclosed the taxes for which the land was sold were assessed, and that the deed from the treasurer to the defendant, on the *face of it*, vests in him a complete title to the land in controversy.

3. That under the fourth section of the act of the 13th March 1815, when lands have been sold for taxes, none but the owner, or his agent duly authorized, can redeem the land; and any offer made by a stranger and without authority from the owner to redeem lands so sold, would not affect the title of the purchaser at treasurer's sale.

4. That if the jury believe the testimony of Joseph F. Quay, of Robert Quay, sen. and Robert Quay, jun., they were neither of them the agent of Jacob Fox, under whom the plaintiff claims, when Robert Quay, jun. called upon William Harris, the treasurer, in May 1828, to attempt to redeem the tract of land in dispute, therefore plaintiff cannot recover.

5. That if the jury believe the testimony of William Harris, and what he has testified to in relation to the declarations of Jacob Fox when he saw him in Philadelphia, in March 1828, and in Williamsport, October 1828, neither of said Quays were the agent of Jacob Fox, nor can the plaintiff set up their acts now to defeat the defendant's title.

6. That if the jury believe that the Quays made the offer to redeem, through Robert Quay, jun., for their own benefit, all the acts of Robert Quay, jun., in relation to the redemption, are void as it regards the present defendant, and do not destroy his treasurer's title.

7. That if the jury believe that Robert Quay made the offer to redeem under a mistaken supposition that he was the owner, or had an interest therein, and when he discovered the mistake disclaimed any further act, such offer to redeem cannot effect the title of the defendant as purchaser at treasurer's sale.

.[Dubois v. Hepburn.]

The court gave the following answer to the defendant's points:

" That if it should appear from the testimony that Oliver S. Wolcott, lessee of the plaintiff, was a citizen, and domiciled in the state of Pennsylvania, on the 25th September 1830, when this suit was brought, this court has no jurisdiction," and the plaintiff cannot recover.

The jury found a verdict for the defendant, and judgment having been entered on the same; the plaintiff prosecuted this writ of error.

The case was argued at January term 1835, by Mr Tilghman and Mr Anthony for the plaintiff, and by Mr Jones for the defendant; and held under advisement to the present term.

Mr Tilghman and Mr Anthon , for the plaintiff, contended—

1. That within two years after the sale of unseated lands in Pennsylvania for taxes, any one has a right to redeem the same for the owner, by the payment of the tax, cost, and per centage.

2. That Robert Quay, Esq. having been the agent of Joseph Fearon, the intestate, during his life, and being a tenant in common, in fee, together with others, of this tract, No. 5615, on the 1st day of February 1825, when the county tax was assessed, for which it was sold on the 12th day of June 1826; had a right to redeem the said tract; although it was at the same time sold for a road tax, assessed subsequent to the partition made on the 26th March 1825.

3. That the court below erred in the answers given to the second, third, fourth, fifth, sixth, seventh, eighth, and twelfth points submitted.

The counsel for the plaintiff in error stated, that the validity of the treasurer's sale would not now be contested; and that the only question which would be raised was, Whether there was a legal redemption of the tract, agreeably to the provisions of the several acts regulating the sale of unseated lands for taxes.

It was admitted, on the argument in the court below, and laid down as law by the judge, that any person, owner or not, may pay the taxes due on unseated lands; and it is evident that the main scope and objects of the act of March 1815 were to adopt

[Dubois v. Hepburn.]

such provisions as would compel the regular payment of the taxes: hence, if any person paid them, it prevented a sale. But it will be urged on the part of the defendant in error, that, after the sale the situation of things is changed; and that the purchaser acquires a right which can only be defeated by the *owner*, or some one authorized by him. To this it may be answered that, by the fourth section of the act of 1815, twenty-five per cent. is allowed to the purchaser as a sufficient compensation for the use of his money, if refunded within two years; and it is of no importance to the county who redeems; nor has the purchaser a right to complain, if he receives his money and twenty-five per cent. additional.

It was, however, contended below, and so held by the judge; that the act of assembly expressly confines the power of redemption to the owner; and that he alone, his agent or attorney, possesses the right. The fourth section says, " if the owner or owners of land sold as aforesaid shall make, *or cause to be made,* an offer, &c. to the treasurer within two years after sale; or in case the owner or owners of lands so sold shall have paid the taxes due on them, then, and in either of these cases, said owner or owners shall be entitled to recover the same by due course of law."

There is no distinction between the owner's paying taxes, and the owner redeeming after sale. In either case he is not entitled to recover the land, unless he shows that the *owner* or *owners* have tendered the redemption money, or have paid the taxes, as the case may be: yet the court below instructed the jury that any person had a right to pay the taxes, notwithstanding the positive restriction in the act, to the owner; and universal usage, ever since the law was enacted, has been for a friend, a neighbor, a stranger, as well as the owner, to pay taxes.

An objection is made to a redemption by a stranger, because it may be against the will of the owner; as he is entitled to the surplus money arising from the sale, after payment of taxes and costs. The same reason would operate if a stranger should volunteer to pay the taxes; because he would as effectually prevent all the imaginary benefits to result from a treasurer's sale, by paying the taxes, as if he redeemed the land after sale. He who

[Dubois v. Hepburn.]

redeems, acquires no more right or title to the land than he who pays the taxes: he performs a mere act of friendship or generosity, which accrues to the benefit of the owner, and unless he expressly disavows the redemption, it ought to be considered valid.

In Wilt v. Franklin, 3 Bin. 502, it was held "that, where a deed is for the benefit of the grantee, it is reasonable that his assent should be presumed."

" The assent of the party that takes is implied in all conveyances, by intendment of law, till the contrary appears; and is as strong as the expression of the party. Stabit presumptio, donec probetur in contrarium." Idem, 519. And again, page 520, "Why should there be a previous consent of the *cestuique trusts*, if they consent afterwards? On legal principles, the acceptance will refer back to the execution of the deed, and form one transaction, done at the same time."

In Brown v. Dysinger, 1 Rawle 408, it was held that "a tender of money in behalf of an infant, made by his uncle, the father being dead, but the mother living, *was good ;* although the uncle had not then been appointed guardian."

In that case the tender was made to defeat an estate held by the party to whom the tender was made; and although, at the time of the tender, the uncle merely acted in the capacity of a friend to the minor ( quasi, a stranger ) yet the court say, page 415, " We think an infant ought not to lose his inheritance, merely because he has no guardian; his uncle or next friend may act for him ; he did so here : the tender by him was well made."

The case of McBride v. Hoey, 2 Watts 436, however, is said to have decided the very question now before the court, and must be taken as authority. To this it may be answered that, in 1 Penn. Rep. 54, the same cause was before the supreme court of Pennsylvania, and it was then decided that the holder of a deed, under a United States sale for the payment of direct tax, had such a right as would authorize him to redeem the same lands from a person who had purchased them at the treasurer's sale for taxes, made in pursuance of the act of assembly.

The question appears to have been fully argued from the two reports of the case, and yet the court came to different conclu-

sions. The last decision, therefore, cannot be considered as binding authority on this court. "Until there shall be a fixed and received construction of the state laws in their own courts they are not to be regarded as the rule of decision in the federal courts." 11 Wheaton 361; 1 Peters 441; 5 Cranch, &c.

Although McBride v. Hoey, from what has been stated, cannot be considered as authority; let us examine the reasoning of the learned judge, who delivered the opinion of the court, in 2 Rawle. He says, "no one but the owner at the time of the sale, his heirs, assigns, or other legal representatives, have the right to receive the surplus money due on the land;" and consequently no other has the power and capacity to redeem. That if a stranger could redeem, the purchaser's title would be set aside; and the owner afterwards refusing to take back the title, might compel him to pay the amount of his surplus bond. To this a conclusive answer may be given here, that, in the present case, the reasoning does not apply; there was no surplus bond, as the land sold for five dollars and fifty-two cents only, being the amount of one year's taxes and costs. "Cessante ratione cessat ipsa lex."

The object of the law was the collection of taxes—the mode of sale and redemption was accessory and incidental to that object. The land, by non-payment of taxes, was liable to be sold; and although the act requires the owner to pay the taxes before sale, and to redeem the land after sale; yet it is next to impossible for the county treasurer to know who is the real owner. The first section of the act of 1815 directs the treasurer "to advertise the number of acres in each tract, and the names of the *warrantees* or *owners thereof:*" yet so little does the treasurer know about the owners, that the millions of acres advertised every year are universally published by their warrantee names, and not the owners. The records of the office give no satisfactory information as to the owner; by alienation, death, &c. he may be changed every year.

When the land is sold, the purchaser holds it for two years subject to redemption, and receives as a compensation twenty-five per cent. on the amount paid by him to the treasurer, if redeemed; but if not redeemed, his title is good. The owner

would have no right to complain, because he is placed in the same situation by the redemption, that he was in before the sale. The law never contemplated a speculation by the owner on a forced sale of his land ; nor would it aid him to take advantage of his own *laches*, if any person should volunteer to redeem the land for him.

But suppose the owner was dissatisfied with the redemption ; he might disavow it before the purchaser receives back his money and per centage ; and instead of the purchaser's title being " *set aside*," it would be confirmed.

It is urged by the counsel in McBride v. Hoey, and reiterated by the judge, that, " by the act of 1815, the right of redemption is given to the owners, and they *alone* are authorized to do it, or cause it to be done ; that they can, in no other case, maintain ejectment, except when they shall have paid the taxes due on it previously to the treasurer's sale." As has been observed, there is no substantial distinction in the phraseology of the two parts of the section ; the payment of taxes must have been by the owner before sale, if he would recover the land sold ; as well as the redemption must have been by the owner after the sale : if there be a distinction it is in favor of redemption ; for if the owner of land sold for taxes shall make, or *cause to be made*, a tender, &c., within two years after sale, it is sufficient : but if the owner would recover because he had paid the taxes due previously to the sale, he must show that he paid them himself, not that he ever *caused it to be done*.

The judge, however, admits that a stranger may redeem without the knowledge or authority of the owner : and that if he afterwards, within the two years, approve of and adopt it, it would be good. His admission is altogether adverse to the answer of the district judge to the seventh and eighth points of plaintiff's counsel, " that, before the treasurer receives the redemption money, it is his duty to satisfy himself that the person tendering it is either owner or agent, or attorney for the owner." If the owner's approbation be sufficient, after the redemption, at any time within the two years ; then the treasurer has no right to inquire by what authority any one offers to redeem ; as the owner may, the next day, ratify the redemption by a perfect stranger.

[Dubois v. Hepburn.]

The error of the conclusion to which the learned judge of the supreme court of Pennsylvania arrived, as is conceived, consists in this, that the sale vested the purchaser of a legal estate in the land, instead of an encumbrance in the nature of a mortgage; hence, he asserts, that "until the owner approves of the redemption, the purchaser at the treasurer's sale cannot be considered as divested of his estate in the land." McBride v. Hoey, 2 Watts 443.

In form, a mortgage is certainly a conveyance; but it is unquestionably treated at law in Pennsylvania in the way it is treated in equity elsewhere, as a bare encumbrance and the accessary of a debt. As between the parties it is a conveyance so far as is necessary to enforce it as a security. As regards third persons, the mortgagor is the owner, even of the legal estate. Presbyterian Congregation v. Wallace. 3 Rawle 128. An ejectment may be supported on a mortgage, 12 S. and R. 240. It is a lien and something more, 1 Peters 441. Although the words grant, bargain, and sell, are in a mortgage, and all the forms of an absolute conveyance in fee are used, with a proviso that *payment* on a certain day shall *alone* render it null and void; yet, as Judge Huston said in Presbyterian Congregation v. Wallace: "No lawyer, no man, no woman, can be mistaken in its import. It is what the law and the universal understanding of all people make it," viz. a security for the payment of money. The words of the mortgage require the *debtor* to pay, or cause to be paid the money for which the land is mortgaged, on or before a certain day, to redeem it from the mortgage; yet, if any body— mortgagor, friend, or stranger, pay the mortgage money on or before, or *after* the day, it is all-sufficient to redeem the land. A treasurer's deed conveys the tract sold to the purchaser. The law gives the owner two years to *pay, or cause to be paid* the redemption money. A stranger, within the limited period, pays the purchase money and per centage, the owner not knowing any thing about it. Will not his subsequent assent, even after the two years have elapsed, relate to the time of redemption; and as in the case of a mortgage, be considered for his benefit, and his approbation presumed? Wilt v. Franklin, 3 Bin. 502.

If the court should, however, be of opinion that some interest

[Dubois v. Hepburn.]

in the land is necessary to authorize a person to redeem, it will then be proper to inquire whether the redemption by Robert Quay be good, under the circumstances of this case.

The counsel for the plaintiff in error then briefly recapitulated the facts, showing that, originally, this tract of land, with many others, belonged to a certain Joseph Fearon, of Philadelphia, who died intestate in April 1810; that these lands descended to his brother's children, of whom Sarah, wife of Robert Quay, was one; that some of the heirs lived in England. Quay lived in the vicinity of this land; it was understood that he should look after it, and his son Joseph had letters of attorney from the heirs in England, to prevent waste and destruction of the timber; that, during the lifetime of Joseph Fearon, Quay was allowed the use of the property in his neighborhood, and cultivated it after his death. James Fearon, administrator of Joseph Fearon, had paid the taxes.

On the 1st of February 1825, the assessor of the proper township returned to the office of the county commissioners, that he had assessed a county tax of 95 cents on this tract No. 5615 of 254 acres; and, on the 29th of April 1825, the supervisors of roads and assessor certified that they had fairly assessed a road tax on said tract of $1 20, which was filed in the county commissioner's office the 3d of May 1825. On the 12th of June 1826, this tract was sold by the county treasurer for one year's taxes of $1 90, and purchased by A. D. Hepburn, for the taxes and costs of sale, $5 12. The treasurer's deed was regularly made and delivered to him.

In the months of March and April 1825, a deed of partition among the heirs was executed, by which the tract in controversy was allotted to the heirs of Abel Fearon, to which Robert Quay and wife belonged; released all their estate, interest, &c. in *said tract* of land, and *warranted* the same against them and their heirs. This deed was recorded on 26th May 1825, and information could not have reached England till June or July.

On the 13th of November 1827, (seventeen months after the sale for taxes,) a partition was made by the heirs of Abel Fearon, and the tract in controversy was allotted to Jacob Fox and wife, in right of his wife, who did not know that it had been sold for

taxes. He had only been in the United States about two months, and was not acquainted with the land titles of Pennsylvania.

Previous to the expiration of the two years allowed for redemption, Mr. Fox was informed of the sale, but he neglected to redeem the tract.

In May 1828, however, before the two years had expired, Robert Quay, one of the parties to the deed of partition, sent his son to the county treasurer, with a written authority to redeem this tract. He went to the treasurer, told him he had come to redeem it, and showed his authority. The treasurer refused to receive the redemption money. He then went to the purchaser and offered him the money, and he refused to take it. Neither Mr. Fox nor his wife knew of Quay's offer to redeem till the two years had expired.

The counsel for the plaintiff in error also contended that in every partition there is a *warranty* that the land is free from encumbrance, and that the county tax assessed previous to the partition, as well as the road tax assessed before the deed was *delivered* to the grantees, were an encumbrance or lien on the land conveyed. " If there be three or four coparcenees, &c., which make partition between them, if the part of the one parcener be defeated by lawful entry, she may enter and occupy the other land with all the other parceners, and compel them to make new partition between them of the other land, Coke Litt. 174 c. Every partition and exchange implies in it and has annexed to it a special warranty in law, Bac. Abr. vol. 7, 231. Taxes on unseated lands have never been considered a charge on the person of the owner. The mode of recovery is by a sale of the land. Burd v. Semple 9, S. & R. 109, 114.

They also urged, that at the time the taxes were assessed and due, Quay was a tenant in common, in right of his wife, of the lands subsequently sold; and that, if before the sale their title was divested by the partition, yet, as the taxes were a lien on the land, it was Quay's duty to remove the encumbrance and prevent a forfeiture; otherwise Fox and wife might compel a new *partition*. The wife of Fox being a feme covert, could do no act herself to prevent a forfeiture; and as the husband was reaping no benefit from the land, if her relations would not in-

[Dubois v. Hepburn.]

terfere on her behalf, the husband could, in all cases, have the wife's lands sold for taxes, without her consent, and her inheritance be destroyed without remedy, by his neglect or refusal to redeem them. The act of assembly, which provides that the conveyance of lands by a feme covert, shall be voluntary, separate and apart from, and without any coercion or compulsion of her husband, would be a dead letter as to unseated lands; as he could always avoid this provision, intended for the security of married women, by suffering a sale, relieving himself from the payment of taxes, pocketing the money, and refusing to redeem. Justice, therefore, required that Quay, who was a cousin of Mrs. Fox, by marriage, should redeem the land for her. When the supreme court of Pennsylvania, in the case of McBride v. Hoey, determined that none but the owner could redeem, they did not define who should be considered as the owner.

The mortgagor and mortgagee would both be considered owners, as the one has a legal and the other an equitable interest in the land. A son for a father; an agent for his principal; a vendor and vendee, where part of the purchase money is paid; a reversioner or remainder-man, where the tenant for life refused; a stranger, if recognised by the owner within the two years; a previous owner, who sold with a warranty, when taxes were due and unpaid, might redeem, though not the owner at the time of sale or redemption.

The conclusion to which the learned judge arrives, in McBride v. Hocy, is, that an interest of some kind in the property is necessary; and if the court believe that Quay had any interest whatever at the time of assessment, or would be injured by the confirmation of the sale; it was his duty to redeem.

In conclusion, they remarked, that the court would construe the law liberally in favor of the landholder, as the purchaser was abundantly compensated for the use of his money; and every principle of justice would seem to sanction the construction, that if the redemption money was paid *for* the owner before the expiration of the two years, the title of the purchaser was thereby divested, and the requirements of the law fulfilled.

[Dubois v. Hepburn.]

Mr. Jones for the defendant in error.

The title of Hepburn was complete in the year 1825, and the offer, in a legal form, to redeem, was made two years after that period.

The object of the different statutes in the state of Pennsylvania on the subject of taxes on unseated or unimproved lands, and of the decisions of the courts under these statutes; has been to enforce and secure the payment of these taxes. Having, in most cases, no owner of such lands resident in the counties in which such lands are situated, the proceedings for their collection are necessarily against the lands; and the non-payment of the taxes, within certain fixed periods, is attended with heavy penalties. If redeemed before two years after the sale for taxes, a large additional sum is to be paid; if not redeemed, the title becomes complete in the purchaser at the tax sale.

The decisions of the courts of Pennsylvania on this subject will be found in 13 Serg. and Rawl. 360, 373, and 208; 1 Penn. Rep. 499; 7 Serg. and Rawl. 392; 10 Serg. and Rawl. 254; 2 Penn. Rep. 502.

The whole of the points made in the case may be reduced to two: all of them except that presented in the 12th point, turn upon the question, whether a stranger can redeem land sold for taxes; and whether Robert Quay stood in any relations to the owner of the land, which would authorize him to redeem it for the benefit of the owner.

It was clearly the intention of the legislature to make tax sales conclusive as to title in the purchasers at such sales. No considerations of hardship can be taken into estimate; and no such consideration can have any influence in a case of this description. The system has been formed by express provision of law. If rules and regulations must be conformed to, every means of giving notice is directed by law. Among these regulations is that under which the claim of the plaintiff is resisted—it is expressly provided that no one but the actual owner of the land can redeem the land after it has been sold for taxes. If Robert Quay was the owner or the legal representative of the owner, he might redeem; but he was neither, and his offer to redeem was made without the knowledge of Fox and wife, to whom the land then

belonged. Fox disavowed the agency of Robert Quay, and charged him with improperly interfering in the redemption; saying he would attend to it himself, but he did not.

It is denied that by the operation of the partition, all the legal representatives of Joseph Fearon had an interest in the land held by Fox and wife, in consequence of the effect of a loss of the property allotted to Fox and wife, by reason of the lien of the taxes, for which the same was sold by the county treasurer. There is no clause of warranty in the partition deed.

But, admitting there was a tenancy in common in the whole lands which descended from Joseph Fearon, it is denied that a tax assessed and unpaid before partition, and the effect of which would be to take from any of the co-tenants the property assigned to him on a partition, would any right over, against a co-tenant. All tne lands had been sul ected to taxation before the division, and, therefore, no inequality of title existed to this property. A tax is not an encumbrance which is saved by a warranty, or the other usual covenants in a deed. There is no implied warranty in a deed of partition, except among co-parceners. 4 Cruise Dig. Art. 16, 17. Id. 434.

Mr. Justice BALDWIN delivered the opinion of the Court.

The land in controversy was granted to Joseph Fearon by the commonweath of Pennsylvania, by patent bearing date the 19th April 1794, from whom the plaintiff deduced a regular chain of title to himself. The defendant claimed in virtue of a sale for taxes, on the 12th June 1826, by the treasurer of Lycoming county; who, by his deed dated 15th July 1826, conveyed the land to the defendant.

No question arose in the court below as to the original title of the plaintiff, or the regularity of the sale for taxes; the case turned upon the redemption of the land, pursuant to the fourth section of the law of Pennsylvania, passed 15th March 1815, providing for the sale of lands for taxes. This section is as follows:

" If the owner or owners of land sold as aforesaid, shall make or cause to be made, within two years after such sale, *an offer* or legal tender of the amount of the taxes for which the said

lands were sold, and the costs, together with the additional sum of twenty-five per cent. on the same, to the county treasurer, who is hereby authorized and required to receive and receipt for the same, and to pay it over to the said purchaser on demand; and if it shall be refused by the said treasurer, or in case the owner or owners of lands so sold shall have paid the taxes due on them previously to the sale, then, and in either of these cases, said owner or owners shall be entitled to recover the same by a due course of law, but in no other case and on no other plea shall an action be sustained."

It appears by the record that before the 1st February 1825, this land was assessed for county tax, ninety cents, and on the 22d April 1825, with road tax, one dollar and twenty cents; it was sold in June 1826, for five dollars and fifty-two cents, the amount of taxes and costs, and purchased by the defendant; that in May 1828, Robert Quay gave his son written directions to pay the county treasurer the taxes and costs for which the land was sold, together with the addition of twenty-five per cent.; whereupon the son offered to pay the same to the treasurer, who refused to accept it, on the ground that his father was not the owner and was not authorized to redeem the land: on a similar offer made to the defendant, he also refused for the same reason. No formal tender was made, or any specific sum offered; but the son had a sufficient sum with him to pay all that was by law necessary to pay, and offered to pay it.

At this time the title to the land was in this situation:

Joseph Fearon, the patentee, died in 1810, intestate and without issue, seized of the land in controversy, together with a number of other tracts of land in the same part of the country: he had two brothers, Abel and William, who died in his lifetime, leaving issue, to whom the estate of their uncle descended in equal shares.

The children of Abel Fearon were Robert, Joseph, Sarah, and Elizabeth; Sarah married Christopher Scarrow, and resided in England; Elizabeth married Jacob Fox, in England in 1812; where they resided till 1827, when they removed to Philadelphia; where Robert and Joseph resided, and where Fox and wife continued to reside.

[Dubois v. Hepburn.]

The children of William Fearon were John, William, Nancy, married to Samuel Brown living in Centre county, James, residing in Philadelphia, and Sarah, married to Robert Quay, residing in Lycoming county, in which the land in question is situated.

James Fearon was the adminstrator of his uncle Joseph, and paid some taxes on the unseated lands of which he died seized. It was understood that those heirs who, from their situation, could most conveniently do it, should look after the unseated lands in their neighborhood ; but no definite arrangement seems to have been made for the payment of the taxes due on the lands.

The lands remained undivided, or so far as appears, without any attempt at partition by the heirs till the 26th March 1825 ; when Robert Quay and wife, Samuel Brown and wife, James and William Fearon, (who survived their brother John,) the children of William Fearon, executed a deed of partition to Joseph Fearon, Elizabeth Fearon, Christopher Scarrow and Sarah his wife, the children of Abel, the consideration of which is thus expressed : " For and in consideration of a quantity of land estimated in value equal to that hereinafter described, to be conveyed by a like release executed by the heirs and legal representatives of Abel Fearon, deceased, and for the sum of one dollar to them in hand paid," &c. " have remised, released, and forever quit claimed, and by these presents do remise, release, and forever quit claim unto Joseph Fearon," &c. " to have and to hold the said tracts of land, lots, and premises above described, unto the said Joseph," &c. " their heirs and assigns forever," with covenant of special warranty. This deed included the land in question, and was recorded in Centre county, 26th May 1825. Robert Fearon had previously died.

No special allotment was made by this deed to the children of Abel Fearon in severalty, nor do they appear to have ever conveyed to the children of William, or to have done any act accepting the partition made by the deed of March 1825, either separately or jointly, as the representatives of their branch of the family, until Fox and wife removed from England to Philadelphia in 1827. On the 13th of November 1827, a paper was executed purporting to be an indenture of partition made between Joseph Fearon, Jacob Fox and wife, and Christopher

[Dubois v. Hepburn.]

Scarrow and wife, reciting the deed of March 1825, and dividing among themselves, in severalty, the lands and lots conveyed to them by that deed ; the tract in question was allotted to Fox and wife.   This paper was signed by Joseph Fearon, Jacob Fox and Elizabeth his wife, who acknowledged it the same day in due form, before a justice of the peace of the county of Philadelphia. It also purported to be executed by Scarrow and wife, by their attorney Nathaniel Nunnelly, but was not acknowledged by him till the 4th of October 1828 ; it was recorded in Lycoming county 25th October 1828.   That this deed was not, in fact, executed by Nunnelly in 1827, appears by his acknowledgment; which states it to have been done in virtue of a power of attorney executed by Scarrow and wife on the 5th June 1828.   That power appears to have been executed on the 25th June 1828, constituting Nunnelly and Jacob Fox, the attorneys of Scarrow and wife, with power to Nunnelly alone, giving full authority over all their property held as one of the heirs of Joseph Fearon, the uncle.   It took no notice of the deed of partition from the heirs of William Fearon to the heirs of Abel, but throughout was predicated on the fact of the estate of Joseph Fearon remaining undivided in the hands of the children of his two brothers as tenants in common.   No construction can be given to it, by which to make it operate as an acceptance of the partition made by the deed of 1825, or any release of the right of Mrs. Scarrow to claim her undivided share of the whole estate of her uncle. There was, besides, a fatal objection to the power of attorney, as there was no separate examination of Mrs. Scarrow, or any acknowledgment by her ; the proof of its execution was by the oath of a subscribing witness, only.   It was afterwards duly acknowledged on her separate examination, on the 8th of September 1832.

On the same day, Scarrow and wife, by their deed, reciting the deeds of partition of 1825, made by the heirs of William Fearon, and of 13th November 1827, by Joseph Fearon, and Fox and wife, Nunnelly their attorney, in October 1828, confirmed them all according to their several allotments.   This deed was regularly acknowledged in England on a separate examination, and recorded the 10th June, 1833.

[Dubois v. Hepburn.]

On the 16th April 1830, Fox and wife conveyed the tract in question to. Valentine, under whom the plaintiff claimed; which conveyance was ratified and confirmed by the deed of confirmation, by Scarrow and wife, on the 8th September 1832.

In March 1827, James Fearon, the administrator of Joseph Fearon the uncle, was informed of the sale of several of the tracts of land belonging to the estate for taxes, of which the tract in question was one. In February 1828, the treasurer of Lycoming county came to Philadelphia, where he met Jacob Fox, Nunnelly, and Joseph Fearon ; he gave them a statement of the tracts which had been sold, and advised them to redeem them or they might be lost. Fox, at first, appeared disposed to redeem, but Nunnelly opposed it ; Fox finally said he would run the risk, as they intended to start in a few days to see the lands; but he paid no attention to them, nor made any offer or attempt to redeem, till October 1828, after the time of redemption had expired. Some negotiation took place between Fox and the defendant afterwards, concerning the land in question, which proved abortive. Fox continued to assert his claim to the land ·till he sold it to Valentine in 1830. Quay made the offer to redeem without any authority from Fox, but from a sense of duty to the heirs; who, he said, would reimburse him if it fell into their hands, and on the expectation that he would, at some time, own it.

It thus appears, that before the execution of the deed of partition, on the 26th March 1825, Robert Quay was, in right of his wife, entitled to an undivided share of the land in question, and continued so entitled until his interest was divested by the legal effect of that deed. The question is, when it took effect as a severance of the joint interest which all the heirs of Joseph Fearon had in his estate ; it could not be by the mere delivery of the deed, by the heirs of William Fearon, to any other than the heirs of Abel Fearon, and on an acceptance by them individually. A partition is inchoate till made by all parties, or till made by one and accepted by the others : there must be a deed of partition, a partition in *pais*, or such acceptance of a deed or partition, as would amount to an estoppel, before the estate can be held in severalty. In this case, the heirs of Abel Fearon do not appear to have been conusant of the deed of 1825. at the time

it was made ; and neither of them had done any act which could amount to an acceptance of the allotment therein made, until its ratification by Fox and Joseph Fearon, by their deed of 13th November 1827, dividing among the heirs of Abel Fearon the several tracts and lots of land conveyed to them undivided. But this left the partition open, till Scarrow and wife would become parties to it ; which was not till the signature of Nunnelly, their attorney, in October 1828, in virtue of the power of attorney executed in June 1828. As, however, this power was not acknowledged by Mrs. Scarrow, so as give any authority to affect her real estate, her interest remained undivided till the deed of confirmation of 8th September 1832, which ratified the partition of 1825, by the solemn act of partition in 1827, among the heirs of Abel, according to the previous allotment, both of which were specially recited and confirmed. This being, in law, equivalent to a deed from them to the heirs of William Fearon, of the residue of the estate of Joseph Fearon, consummated the partition by the act of all the parties in interest. The deed of 1825 then took effect, as a divestiture of the interest of Quay and wife in the land in question, by relation to its date ; but while the partition was in *fieri*, the estate remained undivided. This was in accordance with the terms of the deed of 1825 : the consideration of which was a conveyance to be executed by the heirs of Abel Fearon, of a quantity of land to be estimated equal to what was thus conveyed by the heirs of William. The intention of the parties thus corresponding with the legal effect of their deeds, it is perfectly clear that, till the consummation of the partition in 1832, Quay and wife held an undivided interest in the land in question, as owners thereof, in common with the other heirs of Joseph Fearon ; and the only remaining question is, whether he had a right to redeem from a sale for taxes in May 1828.

A law authorizing the redemption of lands so sold, ought to receive a liberal and benign construction in favor of those whose estates will be otherwise divested, especially where the time allowed is short, an ample indemnity given to the purchaser, and a penalty is imposed on the owner. The purchaser suffers no loss ; he buys with full knowledge that his title cannot be absolute for two years ; if it is defeated by redemption, it reverts to

[Dubois v. Hepburn.]

the lawful proprietors. It would, therefore, seem not to be necessary for the purposes of justice, or to effectuate the objects of the law, that the right to redeem should be narrowed down by a strict construction. In this case, we are abundantly satisfied that it comports with the words and spirit of the law, to consider any person who has any interest in lands sold for taxes, as the owner thereof for the purposes of redemption. Any right, which in law or equity amounts to an ownership in the land; any right of entry upon it, to its possession, or enjoyment, or any part of it, which can be deemed an estate in it, makes the person the owner, so far as it is necessary to give him the right to redeem. The decision of this case does not make it necessary to go further than to determine that Quay, as a part owner, had a right to redeem; that he caused an offer to redeem to be made to the treasurer within two years, as well as to the defendant, both of whom refused to accept the redemption money. This brings the case within the provisions of the law; it does not require a payment or tender; an *offer* and *refusal* is made equivalent to a receipt of the money by the treasurer, and authorizes a recovery of the land by suit, as if no sale had been made.

In instructing the jury that Quay had no right to redeem, there was therefore error in the court below; the judgment must consequently be reversed, and a venire de novo awarded.

This cause came on to be heard on the transcript of the record from the district court of the United States for the western district of Pennsylvania, and was argued by counsel. On consideration whereof, it is ordered and adjudged by this Court, that the judgment of the district court in this cause be and the same is hereby reversed, and that this cause be and the same is hereby remanded to the said district court, with directions to that court to award a venire facias de novo.