Thomas C. ALBERTSON

v.

Raoul D. LECA et al.

No. 81–15–Appeal.

Supreme Court of Rhode Island.

July 7, 1982.

Tillinghast, Collins & Graham, William R. Grimm, Providence, for plaintiff.

Pearlman & Vogel, Thomas W. Pearlman, Morton J. Marks, Providence, for defendants.

## OPINION

WEISBERGER, Justice.

This is an appeal from a judgment of the Superior Court granting the plaintiff's petition to foreclose the defendants' right to redeem certain real estate that the city of Providence sold for delinquent taxes.[1] At a bifurcated hearing the trial justice made two findings against the defendants: first, that the defendants had improperly raised and thus waived any challenges to the validity of the plaintiff's tax title; and second, that the defendants were incapable of properly managing the real estate and therefore were not entitled to redeem. We sustain the first ruling and reverse the second.

On June 1, 1978, the city of Providence acquired title at a tax sale to a parcel of real estate located at the corner of Brown and Barnes Streets in Providence and owned by defendants Anne and Raoul Leca.

---

1. Although we have before us two consolidated appeals, both cases present identical issues and will be treated as a single controversy.

The city more than one year later assigned the tax title to plaintiff Thomas Albertson, who on October 10, 1979, filed in the Superior Court a petition to foreclose the former owners' right of redemption. The trial justice set November 20, 1979, as the return date. Prior to November 20 defendants filed an answer and amended answer opposing foreclosure, seeking redemption, contesting the validity of the tax sale, and setting forth several counterclaims. The defendants did not, however, file specifications of tax-title defects until well after the November 20 return date. On both November 27, 1979, and December 4, 1979, defendants sought to incorporate specifications into the pleadings by way of motions, but both motions were denied. The first stage of the hearing on the petition to foreclose concerned, inter alia, defendants' right to file the specifications after the return date.

The second stage of the hearing centered on defendants' right to redeem the real estate from Albertson. The relevant facts are as follows.

In 1971 defendants Anne and Raoul Leca purchased for $45,000 a six-unit apartment building located at the corner of Brown and Barnes Streets in Providence, Rhode Island. The building was in very poor condition, and Raoul Leca by his own labor sought to make renovations. Leca testified at the redemption hearing in 1980 that since 1971 he had expended $30 to $50,000 in the course of replacing and repairing windows, replacing the existing heating system with modern boilers and baseboard units, plastering ceilings and walls, remodeling kitchens, installing smoke detectors and fire extinguishers, and working on the roof, plumbing, and wiring. Leca stated that he spent 800 to 1,000 hours yearly in the performance of this work.

A deputy state fire marshal on March 1, 1979, found that, despite Leca's efforts, the condition of the building threatened the safety of its seventeen or eighteen residents. The director of the Providence Department of Building Inspection also inspected the Leca premises on March 1, 1979, and at the hearing described the condition of the building as "deplorable." According to this witness the basement was full of debris, sewer pipes were leaking, the building's two stairways were 50 percent without plaster, wiring was exposed, and two upper-floor apartments were without heat. By the hearing date Leca had not yet brought the building officially into compliance with the appropriate fire codes and the minimum-housing code. At the hearing defendants sought with varying success to introduce evidence that they hoped would appeal to the equitable conscience of the court. The trial justice allowed Raoul Leca's testimony that his tax delinquency was caused by diversion of his funds for more compelling needs: Anne Leca's confinement to a psychiatric hospital, Raoul's own treatment for mental illness, and the restoration of another property that was damaged by fire. The trial justice refused to allow, however, testimony that prior to trial Raoul Leca was financially capable of redeeming the property and on several occasions sought to do so. The trial justice also precluded as irrelevant testimony establishing that the city of Providence acquired title to the Leca property for $4,287.14 and assigned it to Albertson for $12,579.22. A real estate expert had previously testified that the building was worth, in its imperfect condition, between $70,000 and $100,000.

On these facts the Superior Court justice made two decisions: (1) that G.L.1956 (1980 Reenactment) § 44–9–31 precluded defendants from challenging the validity of the tax title because defendants had failed to file specifications before the return date and (2) that defendants were not entitled to redeem because they were incapable of restoring the real estate to its intended use. We shall address the issues in the order in which they were presented.

I

Section 44–9–31 states that if one who owns an interest in real estate in respect to which a petition for foreclosure of the right of redemption has been filed seeks to contest the validity of the tax title,

"he shall do so by answer filed in the proceeding on or before the return day, or within such further time as may on motion be allowed by the court, or else be forever barred from contesting or raising the question in any other proceeding. He shall also file specifications setting forth the matters upon which he relies to defeat the title; and unless such specifications are so filed, all questions of the validity or invalidity of the title * * * shall be deemed to have been waived. Upon the filing of the specifications the court shall hear the parties, and shall enter a decree in conformity with the law on the facts found."

The defendants assert that the statutory language does not require the filing of specifications on or before the return day.

■ We concur with the Superior Court justice's determination that the statute does require the filing of specifications on or before the return day. This is the only reasonable construction of the statute. Were the section construed as allowing defendants to file specifications at any time, defendants would be granted a mechanism for indefinitely delaying the hearing on the petition for foreclosure and thus the final disposition of title. This could not have been the Legislature's intent in enacting a statute that seeks as part of its purpose the stabilization of tax titles. *See Picerne v. Sylvestre*, R.I., 404 A.2d 476, 478 (1979). Thus, Anne and Raoul Leca waived their right to challenge the validity of Albertson's tax title by their failure to file specifications on or before the November 20, 1979, return date, or to seek from the court prior to such date a further extension of time to file such specifications.[2]

## II

The second issue before us relates to the exercise of a Superior Court justice's discre-

tion, under § 44-9-29, to allow or to deny redemption of real estate sold for taxes.[3] Relying on dicta in the case of *Picerne v. Sylvestre*, R.I., 404 A.2d 476 (1979), the Superior Court justice determined that title to real estate should be vested in the hands of "responsible" taxpayers. The justice then denied defendants' claim for redemption because defendants not only had demonstrated irresponsibility in maintaining the real estate in a habitable condition but also had shown no ability to restore the property to its intended use as a multiunit dwelling house. We find that the Superior Court justice misconceived the holding of *Picerne* and exceeded the bounds of his statutory discretion.

■ Admittedly, § 44-9-29 does not expressly delineate the boundaries of judicial discretion in redemption proceedings. The statute provides that upon the filing of an answer opposing a petition to foreclose a tax lien,

"the court shall hear the parties, and may in any case in its discretion make a finding allowing the party to redeem, within a time fixed by the court, upon payment to the petitioner of an amount sufficient to cover the original sum, costs, penalties, and all subsequent taxes, costs and interest to which the petitioner may be entitled, together with the costs of the proceeding and such counsel fee as the court deems reasonable. The court may impose such other terms as justice and the circumstances warrant."

Although on its face the statute appears to grant Superior Court justices wide latitude in determining whether redemption shall be granted, the phrase "in its discretion" is here of quite limited meaning. In one sense the term "judicial discretion" simply means judicial judgment, and a judge must

2. The defendants have not asserted any extenuating circumstance for their failure to file within the statutory time limit either the specifications of title defects or a motion for extension of time.

3. The thrust of defendants' argument regarding the redemption issue is that Anne and Raoul

Leca suffered mental and emotional failings during the period of the tax delinquency, and for that reason the time limitations of the redemption statute should be extended. We find in the record no sufficient factual predicate for the assertion of incompetency.

exercise his discretion in accordance with established principles of law. We have recently pointed out in *State v. Tavarozzi*, 446 A.2d 1048 at 1051 (1982), that judicial discretion may be divided into two general categories. The first category of discretion accords to judges freedom of choice unhampered by legal rules. For example, a decision to recess court or to grant a continuance in a case would not normally be reviewable by an appellate court. The second class of judicial discretion involves freedom of choice, but the choices are limited, bounded by law, and reviewable. As one court has stated, the exercise of discretion "is guided by the law—see what the law declares upon a certain statement of facts, and then decide in accordance with the law—so as to do substantial equity and justice." *Faber v. Bruner*, 13 Mo. 541, 543 (1850); *see also* 7 Coke, *Institutes of the Laws of England* 41 (London 1797). We hold that when the facts elicited at a tax-foreclosure proceeding reveal that the party seeking to redeem is ready, willing, and able to do so, established principles of law and equity require the Superior Court judge to allow redemption. A Superior Court justice's discretion then is not to determine which party would be the more responsible landowner, but to determine whether the party seeking to redeem can meet the financial burdens imposed by statute, and if he can, on what terms payment to the purchaser should be made.

Throughout the history of the common law of real property the rights of property holders have received utmost respect. Because security of property was the cornerstone of the pyramidal feudal structure, feudal society countenanced forfeitures of land in only the most compelling circumstances: when a tenant committed high treason or a "blood corrupting" felony and when a tenant deliberately failed to render his feudal obligations.[4] More important to the case at bar, when the Court of Chancery first rose to prominence, it adopted and enforced the feudal policy of disfavoring the involuntary alienation of land. To ameliorate the harshness of the early law of mortgages, Chancery created the equity of redemption. If a defaulting mortgagor instituted suit within a prescribed time period, Chancery would grant redemption upon payment to the mortgagee of the sum due plus damages for the delay. Thus, in the late medieval period Chancery established the rule that equity abhors and will relieve against forfeitures. McClintock, *Handbook of the Principles of Equity* § 3 at 6–8 (2d ed. 1948).

■ When the British colonists settled in America, they carried with them the principles of equity that had been developed by the English courts. In fact, the law of equity was ingrained in the federal judicial scheme by the United States Constitution. *See* U.S.Const. art. III, sec. 2; McClintock, *supra*, § 5 at 12–13. American courts continued to enforce the equitable policy against forfeitures. In the case of *Marshall v. Vicksburg*, 82 U.S. (15 Wall.) 146, 149, 21 L.Ed. 121, 122 (1872), the United States Supreme Court stated that "[e]quity never, under any circumstances, lends its aid to enforce a forfeiture * * *." Although subsequent cases have demonstrated that equity will not relieve against a forfeiture in some cases, the general rule is that

> "[f]orfeitures are not favored in the law. They are often the means of great oppression and injustice. And, where adequate compensation can be made, the law in many cases, and equity in all cases, discharges the forfeiture, upon such compensation being made." *Insurance Co. v. Norton*, 96 U.S. 234, 242, 24 L.Ed. 689, 692 (1877).

Equity has been especially vigilant to relieve against forfeitures when compensation can be made and the forfeiture is merely a

---

4. *See* 1 Blackwell, *A Practical Treatise on the Power to Sell Land for the Non-Payment of Taxes* § 122 (5th ed. 1889); Moynihan, *Introduction to the Law of Real Property* at 1–22 (1962); 1 Pollock & Maitland, *The History of* *English Law before the Time of Edward I* Bk.2, ch. 1, § 11 at 351–56 (2d ed. 1905); 1 Thompson, *Commentaries on the Modern Law of Real Property* §§ 30–34 (Replacement Grimes ed. 1980).

security for the payment of money. *See Klein v. Insurance Co.*, 104 U.S. 88, 90–92, 26 L.Ed. 662, 663 (1881); *Gordon v. Richardson*, 185 Mass. 492, 492–93, 70 N.E. 1027, 1027 (1904); *Tibbets v. Cate*, 66 N.H. 550, 551–52, 22 A. 559, 559 (1891); *Noyes v. Anderson*, 124 N.Y. 175, 179, 26 N.E. 316, 317 (1891).

Historically, then, our law has strongly disfavored forfeitures of real property. This is not to say that in all situations the involuntary alienation of real estate is not tolerable. Although in the United States the fee simple estate is generally allodial, or freely held, rather than feudal, or subject to the greater interest of a lord, Moynihan, *supra*, at 26, the states have retained certain powers to which all private property rights are subject. The powers of eminent domain, condemnation, and taxation authorize governmental interference with or alienation of private property for public purposes.

The government's power to tax real estate is attended by the concomitant power to secure tax payments by levy and sale of property on which taxes are overdue. This is perhaps the most oppressive of the three powers. As Blackwell wrote, "[T]he sale of land for taxes is the nearest approach to tyranny that exists in a free government * * *." 2 Blackwell, *supra*, § 728 at 683. Tax sales are or may be inequitably penal in effect; one may forfeit an estate of great worth for delinquency in paying a tax that is a minute fraction of the property's value. *See Yancey v. Hopkins*, 15 Va. (1 Munf.) 419, 428 (1810); 1 Blackwell, *supra*, § 121 at 117. The inequity of the owner's inordinate loss is often matched by the inequity of the tax-sale purchaser's inordinate gain. For the relatively small sum that the owner was unable to pay, the purchaser can acquire the entire estate. Thus, the purchaser may "obtain acres for cents," achieving through speculation what another has lost through misfortune. *See Lessee of Hughey v. Horrel & Co.*, 2 Ohio 231, 233 (1826); 4 Tiffany, *The Law of Real Property* § 1248 at 1153 (3d ed. 1975).

Legislatures and courts have acted to ameliorate the severity of tax forfeitures. Although tax-sale statutes furnish a strong arm with which to enforce the government's right to its revenues, the statutes also protect the right of property owners to their real estate. Generally state statutes grant delinquent taxpayers the right to redeem their real estate by payment of compensatory sums to the purchaser within a prescribed time period. Because the right of redemption is a valuable property right, *Brink v. Curless*, 209 N.W.2d 758, 770 (N.D.1973), and the potential loss to the owner is grave, the courts have as a matter of general policy interpreted tax statutes liberally in favor of redemption. *See Dubois v. Hepburn*, 35 U.S. (10 Pet.) 1, 22–23, 9 L.Ed. 325, 332–33 (1836); *West v. Board of Selectmen*, 345 Mass. 547, 550, 188 N.E.2d 473, 475 (1963); *Brink v. Curless*, 209 N.W.2d at 770; *Home Owners' Loan Corp. v. Stevens*, 98 Utah 126, 135, 97 P.2d 744, 748 (1940); *see also Parker v. MacCue*, 54 R.I. 270, 272, 172 A. 725, 726 (1934) (tax statutes construed to favor owner).

We now turn specifically to the law of Rhode Island and the facts of the case at bar. The Rhode Island tax statute strikes a fair balance between the interests of the government and private property rights— the state may move quickly to obtain by sale the taxes due, but the owner has ample opportunity to redeem his real estate. The law provides that the taxes assessed on a parcel of real estate constitute a lien against the property. Section 44–9–1. If payment is overdue, the tax collector, after proper notice and advertisement, may sell the property or some portion of it at public auction for the amount of taxes and other costs due. Sections 44–9–8 and 44–9–9. One who purchases property at a tax sale acquires a title that is contingent upon owner's nonredemption. Section 44–9–12. The owner unconditionally may redeem the real estate at any time prior to the filing of a petition to foreclose the right of redemption. Section 44–9–21. Upon the filing of a foreclosure petition and an answer by the owner seeking redemption, a justice of the Superior Court will conduct a hearing to

determine whether or not redemption should be granted. Sections 44–9–25 and 44–9–29. If redemption is denied, the purchaser's title becomes absolute. Section § 44–9–24. The purchaser may not file a foreclosure petition until one year after the date of the tax sale, and he has no right to the possession, rent, or profits of the property for that one-year period. Sections 44–9–25 and 44–9–12.

■ The tax-sale statute vests Superior Court justices with discretion to allow redemption and to set terms of payment. Sections 44–9–25 and 44–9–29. The issue before us is whether this statutory grant of discretion authorizes judges to deny redemption on the basis that the owner is an "irresponsible" property manager. We hold that the only proper basis for denying redemption is that the party seeking to redeem is financially incapable of so doing.[5]

■ Our holding is impelled by the venerable principles of law explicated earlier in this opinion. Throughout the history of our law the rights of private property owners have received paramount legal respect. In feudal times "governmental" authorities (the king and the mesne lords) could not divest property holders of their interests except for compelling reasons of societal import. Similarly modern American governments may interfere with private property interests only for reasons of public necessity. The necessary reason of tax takings is to secure payment of public revenues. Once a purchaser of property at a tax sale has paid the tax collector, however, the government's interest is fully satisfied. Thus, no legitimate interest of the state pursuant to its taxing power is served by denying redemption to a former owner who is ready, willing, and able to redeem.[6]

Well-established principles of equity also require Superior Court justices to grant re-

demption to persons capable of redeeming. The Rhode Island tax-sale statute expressly provides that proceedings pursuant to it are to accord with the practice and procedure of equity. Section 44–9–33; see Pratt v. Woolley, 117 R.I. 154, 365 A.2d 424 (1976) (tax sale proceedings to accord with equity although statute doesn't grant general equitable jurisdiction). Thus, the principle that equity abhors a forfeiture, as well as the general policy of courts to favor redemption, is here of particular application. Tax-sale forfeitures clearly are of the type against which courts of equity universally grant relief. As has been indicated, the forfeiture of land because of tax delinquency is an extremely drastic penalty. Moreover, the penalty is imposed merely to secure the payment of tax moneys. Of great importance is the fact that redemption fully compensates the purchaser for his speculative investment. In the case at bar were the Lecas able but not permitted to redeem, Albertson would achieve by virtue of approximately a $12,000 investment a property worth nearly $100,000. Were redemption granted, Albertson would lose nothing; to redeem, the Lecas must reimburse Albertson for his expenditures and pay a penalty. For these reasons a Superior Court justice must allow redemption to one who is ready, willing, and able to redeem.

There are other persuasive reasons that judges must grant redemption to willing and able owners. In Picerne v. Sylvestre, R.I., 404 A.2d 476, 478 (1979), this court indicated in dictum that one purpose of tax-sale legislation was to vest real property in the hands of "responsible" persons who "would assume and pay their fair share of the tax burden." The court below construed this language as requiring denial of redemption to one who was unable to place his property in a habitable condition, al-

---

5. In the event that an owner of real estate is an inefficient property manager, he should be allowed the opportunity to sell the real estate for its market value rather than have it irrevocably transferred to another for a fraction of its value.

6. Certainly the state has a legitimate interest pursuant to its police power in protecting the public from the hazards of unsafe and unhealthful buildings. Enforcement of housing and fire codes, however, is a power completely distinct from the authority of the state or municipality to tax real property and to enforce payment.

though that person claimed to have been ready, willing, and able to redeem. The Superior Court justice erred in equating the "responsibility" indicated in this dictum with "responsibility" in the sense of efficiency as a landlord. Clearly the focus of the *Picerne* language centers exclusively upon the ability of a party to pay taxes.

The *Picerne* court also indicated a second purpose of tax-sale statutes: the stabilization of tax titles. *Id.* The statute accomplishes tax-title stabilization by prescribing a time limit for redemption and providing for a court hearing to settle absolutely the rights of interested parties. The time limit arises at least one year from the tax sale when the purchaser petitions for foreclosure and the Superior Court conducts a hearing. Prior to the filing of the petition, an owner who can tender the appropriate moneys for redemption has the absolute right to do so and to regain clear title to the property. We see nothing talismanic about a petition for foreclosure or a redemption hearing that transforms an owner's right to redeem if financially capable into a right to redeem only if capable of appropriately managing the property. The hearing is simply a mechanism for clearing the title of tax-sold real estate. Prior to and after the filing of a foreclosure petition, the right of an owner to redeem is contingent only upon his willingness and ability to pay the prescribed compensatory amounts.

In sum, the Superior Court justice's discretion at a redemption hearing is to determine if the party seeking redemption is ready, willing, and able to tender the redemption moneys. Guided by the facts of the particular case, the Superior Court justice also has the discretion to set appropriate terms and conditions of payment. In the case at bar the Superior Court judge made no finding concerning Anne and Raoul Leca's readiness and ability to redeem. Rather, he denied redemption for the impermissible reason that the defendants had demonstrated insufficient ability to restore the property to its intended use as an apartment building.

For these reasons the judgment denying redemption is vacated, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

SHEA, J., did not participate.