**STATE**

v.

**Robert MUSUMECI.**

**No. 96–266–C.A.**

Supreme Court of Rhode Island.

Aug. 4, 1998.

Randy Olen, Providence, John F. Cicilline, Bristol, for plaintiff.

Lauren Sandler Zurier; Aaron Weisman, David D. Prior, Providence; Steven John DeLuca, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

In the middle of a criminal trial charging the defendant, Robert Musumeci (Musumeci), with illegal possession of marijuana, a Superior Court justice denied Musumeci's dismissal motion but granted his motion for a mistrial because of the state's grossly negligent (albeit nondeliberate) failure to comply in a timely manner with its discovery obligations. Ten months later, a second trial justice dismissed the charges against Musumeci for the same discovery violation that led to the earlier mistrial. The state's appeal from that adverse judgment requires us to answer the following question: Was the second trial justice warranted in dismissing the charges after the first trial justice had refused to do so and instead had declared a mistrial because of the state's late production of discoverable evidence? We hold that she was not. Absent proof of substantial prejudice accruing to Musumeci during the ten months between the mistrial declaration and the convening of the second trial that could not have been remedied by one or more alternative measures, the second trial justice should not have dismissed the charges.

### Facts and Travel

In early 1993 an undercover police officer (officer) posed as a truckdriver working for the North Providence public works department (DPW).[1] The officer befriended Musumeci, a regular DPW employee. Over the course of the next several months the officer repeatedly approached Musumeci and communicated his desire to obtain marijuana for a fictitious girlfriend. In time, Musumeci promised that he would try to secure some of this substance from his friends. Initially Musumeci failed or declined to make good on his illicit promise, claiming that he could not procure any marijuana of good quality. Eventually, however, Musumeci did deliver to the officer one-quarter ounce of "killer

1. Justice Goldberg's concurring and dissenting opinion (hereinafter referred to as the dissent) suggests that the investigating officer in this case should not be referred to as an "undercover police officer" but merely as "an applicant for a law enforcement position with the North Providence police department who in the hopes of being hired for a full-time patrolmen's position accepted an offer to participate in the investigation. This is a significant distinction," according to the dissent, because "this 'officer' had absolutely no prior training, which may very well lend support to the entrapment defense planned by Musumeci's counsel. Moreover this witness, not a paid police informant, certainly had a vested interest in the success of the investigation." Respectfully we disagree with this reasoning because in this case the distinction drawn is one without any material difference. The undeniable fact is that the officer in question was operating in an undercover capacity by concealing his affiliation with the North Providence police department from Musumeci. Whether the officer's presumed "interest in the success of the investigation" arose out of his pending application for a full-time-patrolman's position or out of his hope that good police work would be rewarded in some other way is immaterial because it is unlikely that his interest would be substantially different from the interest that any police officer functioning in an undercover role would have in the success of such an investigation. Although the specific motive for desiring such success may vary from officer to officer depending on his or her particular personal career circumstances 'at the time of the investigation (applying for a full-time position versus hoping for a promotion versus desiring a favorable employment review versus wanting to be recognized for savvy police work, and so forth), the officer's natural desire for the investigation to succeed is a constant, whatever his or her particular employment status may be while the investigation is proceeding. And any alleged deficiencies or gaps in the officer's training were fair game for the defense to exploit at trial regardless of his particular employment status at the time he performed the undercover work in question.

weed," later determined to be marijuana, in exchange for $50.

The state charged Musumeci with one count of unlawful delivery of marijuana in violation of G.L.1956 § 21–28–4.01(A)(2)(a) of the Rhode Island General Laws and the case proceeded to trial in the Superior Court. In his opening statement Musumeci's lawyer stated to the jury that he would prove police entrapment as a defense to the drug-delivery charge. He also suggested that Musumeci had never used and had never been involved with illegal drugs and that he had procured the marijuana merely as a favor to his new-found false friend at the DPW.

During cross-examination of the officer, whom the state called as its first trial witness, defense counsel learned for the first time that the officer had kept a daily log of his undercover investigation. But the state had failed to produce the log during pretrial discovery—or to notify defense counsel or the court of its existence—despite Musumeci's unobjected-to discovery requests calling for the production of such information. The prosecutor claimed that until the officer's trial cross-examination, he too had been unaware of the log's existence. Nonetheless the state immediately located and produced the log, giving it to Musumeci later that same day. As it turned out, certain entries in the log suggested that, contrary to defense counsel's assertions in his opening statement, Musumeci was intimately familiar with the local drug culture and had in fact used drugs on other occasions. In addition the log alluded to other individuals at the DPW who may have witnessed or overheard some of the alleged communication between Musumeci and the officer that led to the drug purchase.

Musumeci moved to dismiss the charge. He argued that the taint flowing from the log's late disclosure and the now-impeachable representations made in his counsel's opening statement merited dismissal or, alternatively, suppression of the log. The trial justice ruled that although the prosecution's nondisclosure of the log was apparently unintentional, it constituted a clear violation of Rule 16 of the Superior Court Rules of Criminal Procedure. However, this first trial justice expressly rejected Musumeci's entreaties to exclude the log from the prosecution's trial evidence altogether or to dismiss the charge outright, considering those remedies unwarranted. He defended his decision explaining, "I think it's too severe a sanction to dismiss it [the information]." Having failed to secure a dismissal or suppression of the evidence, the defendant then requested that the trial justice declare a mistrial. The trial justice granted this request because, in reliance upon the evidence before him, he determined this would be the appropriate sanction to rectify any prejudice to defendant. It is notable that the trial justice did not grant the mistrial conditioned on further consideration of defendant's motion for dismissal, nor did he in any other fashion reserve ruling on the requested dismissal. Rather he flatly denied defendant's motion for dismissal and granted defendant's motion for mistrial.[2]

Shortly thereafter, Musumeci filed a motion to dismiss based solely on double-jeopardy grounds. The motion was continued to the time of trial. On February 1, 1996, some ten months after the mistrial, the parties convened for Musumeci's second trial before another justice of the Superior Court (the second trial justice). Without objection from the state, Musumeci's lawyer questioned the officer and his supervisor concerning the circumstances surrounding the log's nonproduc-

---

2. Although the first trial justice stated that "[i]t's not such I feel I can on my own dismiss it. If somebody is reading it later on somebody else might dismiss it," we do not construe his remarks to indicate that his denial of defendant's Super.R.Crim.P. 16 dismissal motion was provisional. He may simply have been acknowledging the possibility that a later showing of prejudice to defendant might warrant another justice in granting a dismissal. But the context of his colloquy with the prosecutor on this point indicates that he was more likely referring either to a later-filed double-jeopardy-based dismissal motion or to this Court's possible appellate re-

view than to another justice of the Superior Court's taking a second look at his Rule 16 sanctions ruling. And as previously noted, he had earlier stated that "I think it's too severe a sanction to dismiss it [the information]." Moreover, contrary to the dissent's assertion that "Musumeci clearly did not 'request' a mistrial," that is exactly what the defendant's lawyer did when he explicitly asked the trial justice to grant a mistrial. While he may have been reluctant to do so, and moved for this remedy only as a last resort, nonetheless the defendant's lawyer clearly and unmistakably requested the trial justice to grant this specific relief.

tion before the start of the first trial and concerning what they knew about the contents thereof. Although defense counsel examined these police officers extensively, he made no showing that he had attempted to interview any of the potential witnesses mentioned in the log, nor did he prove that any of these potential witnesses were now unavailable or were otherwise incapable of being interviewed. Nor did defense counsel make any showing of any additional form of prejudice to Musumeci resulting from the log's late disclosure—other than the initial surprise he suffered upon learning of the log's existence and of the factual contradictions between the log's entries and his opening statement in the first trial.

Before ruling on the dismissal motion, the second trial justice acknowledged that the state's nondisclosure of the log appeared to be unintentional and that the first trial justice had declined to dismiss the indictment. Nonetheless, she granted Musumeci's renewed motion to dismiss the charges on the grounds that the state's grossly negligent nondisclosure of the log had prevented defense counsel from interviewing potential witnesses while events were still fresh in their minds and that the dismissal sanction would serve as a deterrent to any future such instances of negligent nondisclosure of discoverable evidence by the prosecution. The second trial justice noted that she considered the state's Rule 16 violation to be a "very, very grave" matter and that "very elemental preparation would have disclosed the existence of these extremely important notes."

The state appeals from the second trial justice's dismissal order. It alleges that, in the circumstances of this case, (1) dismissal of the indictment was an abuse of the second trial justice's discretion and (2) the law-of-the-case doctrine forbade the second justice from reexamining the first justice's ruling in regard to the appropriate sanction for the state's Rule 16 violation.

### Analysis

### I

### Propriety of Dismissal as a Discovery–Violation Sanction

Rule 16(i) of the Superior Court Rules of Criminal Procedure authorizes the trial court to impose a specified range of sanctions for discovery violations or to "enter such other order as it deems appropriate." Rule 16, like its federal counterpart, seeks to promote "[b]roader discovery by both the defense and the prosecution [in order to] contribute to the fair and efficient administration of criminal justice by aiding in informed plea negotiations, by minimizing the undesirable effect of surprise at trial, and by otherwise contributing to an accurate determination of the issue of guilt or innocence." *State v. Coelho,* 454 A.2d 241, 244 (R.I.1982) (quoting Fed. R.Crim.P. 16 advisory comm. note).

■ Because the trial justice is in the best position to determine the harm resulting from a discovery-rules violation and can best assess the possibility of mitigating that harm, his or her ruling on what sanction should be imposed on that score will not be overturned absent a clear abuse of discretion. *Coelho,* 454 A.2d at 244–45; *see also State v. Quintal,* 479 A.2d 117, 119 (R.I.1984); *State v. Darcy,* 442 A.2d 900, 902 (R.I.1982). However, the trial court's discretion is not without limits and is reviewable by this Court for an alleged abuse thereof. *See Coelho,* 454 A.2d at 245; *Darcy,* 442 A.2d at 902. In *Coelho* we set out four factors to be considered by the trial court, together with all the other facts and circumstances, when choosing an appropriate sanction for a party's violation of Rule 16's discovery and disclosure requirements: (1) the reasons for the nondisclosure or other violation, (2) any prejudice caused to the opposing party, (3) the feasibility of rectifying any prejudice, and (4) any other relevant factors. 454 A.2d at 245.

Although a dismissal of the pending charges is not one of the expressly enumerated discovery violation sanctions specified by Rule 16, this Court previously has recognized that pretrial case dismissal is both an available and a permitted Rule 16(i) discovery-violation remedy in circumstances where there has been a "repeated unexcused failure of the prosecution to make discovery in accordance with Rule 16 of the Superior Court Rules of Criminal Procedure" after a Superi-

or Court justice had previously ordered the prosecution to do so. *See State v. Rawlinson*, No. 85–261–C.A. (R.I., unpublished order, filed October 16, 1986) (quoted in *State v. DiPrete*, 710 A.2d 1266, 1292 (R.I.1998) (Bourcier, J., dissenting)); *see also State v. Quintal*, 479 A.2d 117 (R.I.1984). However, few reported cases have reached this Court after the extreme sanction of a dismissal order has been imposed as a discovery violation sanction.[3]

Recently, in *DiPrete* this Court vacated a Superior Court justice's pretrial dismissal of an indictment based upon the prosecution's discovery violations in circumstances where the allegedly wrongfully withheld information was eventually produced by the state. 710 A.2d at 1274, 1276–77. The *DiPrete* defendants had argued that the prosecution's discovery violations had prejudiced their right to a fair trial because in the course of moving for sanctions on account of the prosecution's discovery noncompliance, the defendants had been forced to reveal their trial strategy for impeaching the state's key witnesses. *Id.* at 1269. But this Court held that the indictment in that case should not have been dismissed because such alleged prejudice was insufficient to warrant dismissal of the charges. *Id.* at 1273–74.

However, in *Quintal* this Court affirmed such a dismissal sanction when the prosecution had repeatedly failed to produce the requested discovery materials notwithstanding the trial court's previous entry of a conditional dismissal order providing for this disposition if the requested information was not produced by a date certain (an order that the state then ignored). 479 A.2d at 118. After the state still failed to comply with its discovery duties, we noted that "[n]one of the sanctions specifically provided for in Rule 16(i) could possibly have neutralized the prejudice suffered by defendant" because the state's noncompliance with the court's production order continued to deny the defendant any opportunity to examine the requested discovery materials or to avail himself of the potential advantages that might have flowed from doing so. *Id.* at 119. Thus, in light of the state's persistent and deliberate refusal to comply with the court-ordered discovery and the unavailability of another effective sanction, we affirmed the trial justice's dismissal order in *Quintal*, observing that "the state's noncompliance robbed defendant of the very tools needed to establish the requisite prejudice." *Id.* at 120.

In this case the first trial justice found that the state's conduct presented "a very grievous violation" of the discovery rules. However, after reviewing the factors set out in *Coelho*, that justice expressly rejected dismissal as the appropriate sanction for the state's negligent but nondeliberate misconduct and decided instead that a mistrial would likely cure any resulting prejudice to defendant. We view that decision as falling well within the first trial justice's considered discretion. *See State v. Simpson*, 595 A.2d 803 (R.I.1991) (mistrial or continuance required to mitigate late disclosure of discover material); *State v. Verlaque*, 465 A.2d 207 (R.I.1983) (noting that early disclosure of discoverable evidence is essential to allow

---

3. In *State v. Rawlinson*, 526 A.2d 1278 (R.I. 1987), the defendant was tried and convicted by a Superior Court trial jury. In his appeal to this Court he alleged as one of his reasons for appeal that a Superior Court justice had previously dismissed a criminal information containing the same charges upon which he was later tried and convicted. The earlier information had been dismissed on defendant's motion because of the state's repeated failure to comply with previously entered court orders requiring it to abide by the discovery provisions of Rule 16. In the course of the appeal, this Court entered an unpublished order in which it acknowledged the "ample authority" of a trial justice in such circumstances to grant a defendant's pretrial motion to dismiss the case with prejudice because of "the persistent failure of the prosecution to make discov-

ery" pursuant to the previously entered (but ignored) Rule 16 discovery orders. *See State v. DiPrete*, 710 A.2d 1266, 1293 (R.I.1998) (Bourcier, J., dissenting) (quoting *State v. Rawlinson*, No. 95–261–C.A. (R.I., unpublished order, filed October 16, 1986)).

Although the *Rawlinson* court's published per curiam opinion did not discuss further the propriety of the earlier dismissal order, this Court held that the previous dismissal precluded the defendant's later prosecution on a subsequent information. As a result, Rawlinson's conviction was vacated. Thus, to date *DiPrete* and *Quintal* remain the only reported cases that we have been able to locate in which this Court has specifically considered the merits of a Superior Court's dismissal sanction for a Rule 16 discovery violation.

counsel to marshal a defense); *State v. Coelho,* 454 A.2d 241 (R.I.1982) (declaring mistrial where late disclosure of discovery materials reduced effectiveness and increased difficulty of defense counsel's efforts); *State v. Darcy,* 442 A.2d 900 (R.I.1982) (late disclosure rendered defense strategy ineffective or even counterproductive).

When the second trial justice revisited this same issue ten months later, she placed considerably greater emphasis on the prejudice she perceived that defendant necessarily must have suffered because of his lost opportunity to interview the potential witnesses identified in the log when the events at issue were still relatively fresh in their memories. She also gave great weight to what remedy she determined was needed to deter prosecutors from committing such discovery abuses in the future. But on these facts we are not persuaded that the second trial justice properly exercised her discretion in deciding to administer the extreme sanction of dismissal.[4]

Here, in contrast to the situation in *Quintal,* the state eventually did produce the wrongfully withheld information and gave it to the defense after the court had ordered it to do so. Thus the prosecution's late production of discoverable material—rather than its nonproduction after a court order to do so—is the ultimate discovery transgression at issue here. The first trial justice's declaration of a mistrial and the ten-month interval between trials would also seem to have been intended to alleviate most of, if not all, the substantial prejudice resulting to the defendant from the factual "ambush" that occurred during the first trial and from defense counsel's unwitting opening remarks about his client's drug-free past.[5] Although the second trial justice was justifiably concerned about the potential staleness of the evidentiary leads belatedly revealed in the log—concerns that may have proven to be entirely valid—Musumeci presented absolutely no evidence that the state's late production of the log had prevented him from locating or interviewing these witnesses during the ten months following the mistrial declaration or from obtaining any information he needed from them to establish any defense he may have had to the charge. Indeed, there is no indication that he made any effort at all to locate or to talk to those witnesses after obtaining the log and the trial continuance, much less that the information they would have imparted to him was material to any defense Musumeci could have raised to the charge against him.

Had Musumeci shown that certain material witnesses had died, that they had suffered memory losses or other testimonial impairment, or that they had become substantially less helpful to the defense than they otherwise would have been if the log had been disclosed in a timely fashion, the second trial justice would have been presented with an expanded evidentiary record different from the one that the first trial justice had faced and, perhaps, with a more compelling case for dismissal. But absent any such showing by Musumeci, the second trial justice should not have assumed or posited the existence of such irremediable and material prejudice inuring to Musumeci after the mistrial decla-

---

4. A trial justice's discretion to choose dismissal of the charges as a sanction for the prosecution's discovery violation constitutes an exercise of judicial discretion that is limited, bounded by the law, and reviewable for an abuse thereof when, under the circumstances, "a choice made is not within the discretionary area established by the law." *State v. Tavarozzi,* 446 A.2d 1048, 1051 n. 1 (R.I.1982).

"An exercise of judicial discretion may be classified as belonging to one of two general categories. The first type accords to judges freedom of choice in areas unhampered by legal rules. A simple yet familiar example is a decision to recess court. Such a determination is unreviewable. *The second class of judicial discretion also involves freedom of choice but the choices are limited, bounded by the law, and reviewable.* Lord Coke has defined this category of discretion as 'discernere per legem quid sit justum' ('to see what would be just according to the laws in the premises'). 7 Coke, *Institutes of the Laws of England* 41 (London, 1797). *An abuse of this type of discretion occurs when a choice made is not within the discretionary area established by the law." Tavarozzi,* 446 A.2d at 1051 n. 1. (Emphases added.)

5. The second justice acknowledged as much during the hearing on Musumeci's renewed dismissal motion when she stated, "Didn't you already get your Rule 16 remedied which was the trial judge declaring a mistrial?"

ration such that her *Coelho* analysis could jump to a dismissal disposition without the need for any evidentiary showing of such prejudice. Thus, contrary to the dissent's hypothetical concern about prosecutorial discovery violations causing a defendant to be unjustly convicted of criminal charges, this was not a situation where the defendant could substantiate that he would be "convicted and in jail as a result of prosecutorial misconduct" unless the charges against him were dismissed. Moreover, the dissent's reliance upon cases suggesting that "proof of prejudice is unnecessary where there has been intentional and deliberate nondisclosure" is misplaced because those cases have to do with granting a new trial to a defendant because of the prosecution's deliberate nondisclosure of exculpatory evidence, *see, e.g., State v. Wyche,* 518 A.2d 907 (R.I.1986), and not, as here, with dismissing an indictment for the state's negligence in failing to disclose additional inculpatory evidence in a timely fashion.

■ The second trial justice was also obviously intent on sending a message to prosecutors that such future discovery misconduct would not be tolerated. Although punishment and deterrence are valid and important considerations in selecting a sanction under Rule 16 and the trial justice should choose a sanction sufficiently potent to achieve such goals when the circumstances call for such a result, even weightier policy considerations favor resolution of criminal charges on their merits. *See, e.g., United States v. Blue,* 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510, 515 (1966) (reversing the dismissal of an indictment for the government's violation of the defendant's Fifth Amendment rights because barring the prosecution would "increase to an intolerable degree interference with the public interest

in having the guilty brought to book"). Thus dismissals of all pending criminal charges for the state's commission of discovery violations are to be disfavored save in the most extreme circumstances. *See DiPrete,* 710 A.2d at 1274. Indeed, we conclude that dismissal is an appropriate sanction only as a last resort and only when less drastic sanctions would be unlikely or ill suited to achieve compliance, to deter future violations of this kind, and to remedy any material prejudice to defendant.[6] *See Darcy,* 442 A.2d at 902 (trial court should employ mistrial—and *a fortiori* dismissal—only "[i]f no other available discretionary measures can possibly neutralize the harmful effect").[7]

■ Even though the second trial justice in this case was understandably angered by the state's inexcusable lack of preparation and its unwillingness at the hearing before her to acknowledge fully the consequences and impropriety of its actions in failing to discover and to produce the log in a timely fashion, the burden of any dismissal sanction ultimately falls squarely on the people of this state and not solely upon the Attorney General's office. And although we agree with the second trial justice's observation that defendant is entitled to a "trial by jury, not trial by ambush," we are also of the opinion that as a general rule, and subject to constitutional safeguards, a criminal defendant should not "go free because the constable [or the prosecution] has blundered." *People v. Defore,* 242 N.Y. 13, 150 N.E. 585, 587 (1926) (Cardozo, J.). Absent substantial prejudice and a showing that "no other available discretionary measures can possibly neutralize the harmful effect [of the prosecution's discovery violations]," *Darcy,* 442 A.2d at 902, some other remedy(ies) and/or sanction(s) (including, for example, a trial continuance, a mistrial, evidence preclusion, an order re-

---

6. Nothing we say here, however, is intended to discourage the Superior Court's use of conditional dismissal orders as a sanction for discovery noncompliance, or to the entry of dismissal judgments following the state's noncompliance with such orders. But in this case, no such conditional order had been entered, much less violated, before the court pounded its dismissal hammer.

7. This accords with the general rule in federal criminal cases that the trial justice "should im-

pose the least severe sanction necessary to ensure compliance with its discovery orders," *see* 25 *Moore's Federal Practice* § 616.02[4][d], at 616–21 (3d ed.1998), and that dismissal is inappropriate absent flagrant abuse causing substantial prejudice to the other party. *See, e.g., United States v. Taylor,* 13 F.3d 986, 991 (6th Cir.1994); *United States v. Jacobs,* 855 F.2d 652, 655–56 (9th Cir.1988).

quiring the state and/or the offending prosecutor(s) to reimburse all or a specified dollar amount of the reasonable attorney fees and other expenses incurred by the defendant as a result of the discovery violation, and/or referral of the offending prosecutor(s) to bar disciplinary counsel) should generally be imposed—at least in the first instance—upon the court's learning of a material discovery violation, even when, as here, the prosecution is guilty of grossly negligent misconduct.[8]

In addition, the first trial justice, who had most of these same facts before him, had already decided that dismissal was too severe a sanction. Although we need not determine whether the law-of-the-case doctrine should have at least presumptively barred any reexamination of this initial ruling, the fact that the first justice had already passed on this matter should have factored heavily into the second justice's analysis of the propriety of dismissal in the absence of any showing of subsequent prejudice to the defendant.

In light of all the circumstances presented in this record, we hold that the second trial justice, while *appropriately concerned about* protecting defendant's right to a fair trial and about deterring future discovery noncompliance by the prosecution, nonetheless abused her discretion by granting defendant's motion to dismiss the indictment. "An abuse of this type of discretion occurs when a choice made is not within the discretionary area established by the law." *State v. Tavarozzi*, 446 A.2d 1048, 1051 n. 1 (R.I.1982). After the first trial justice had denied defendant's dismissal request and instead had declared a mistrial, and after defendant failed to make any showing of some new form of substantial prejudice that defendant could not have raised before the first trial justice and that the second trial justice could not

have remedied through the imposition of some alternative sanction(s), the second trial justice was not at liberty to dismiss the charges and thereby countermand the discovery-violation remedy selected by the first trial justice.

## II

### *Stare Decisis*

The Chief Justice's concurring and dissenting opinion (hereinafter referred to as the concurring opinion) chides the majority for its failure to follow the "no authority" rationale adopted by the *DiPrete* majority in reversing the dismissal of the indictment in that case. However, *notwithstanding our* disagreement with the "no authority" test used in *DiPrete* to evaluate the motion justice's dismissal sanction in that case, we do no violence to the doctrine of *stare decisis* here because our holding in this case reversing the indictment's dismissal is consistent with the same result reached by the Court in *DiPrete*. Further, *DiPrete*'s "no authority" language was not essential to the Court's reversal of the indictment's dismissal in that case, and is therefore mere dicta. *See, e.g., Newport Electric Corp. v. Public Utilities Commission*, 454 A.2d 1224, 1225 (R.I.1983) (that portion of Public Utilities Commission report and order opining that future viability of electric company was questionable and that the company's management was efficient "was not necessary to the commission's decision and therefore constituted *obiter dictum*").

██ Nevertheless, it may be useful to recall that "stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence in-

---

**8.** Contrary to the statement in the dissent, we make no "pronouncement that weightier policy considerations dictate that we overlook gross negligence by the prosecution if it means a criminal defendant will 'go free.'" Nor do we adopt what the dissent calls "the majority's intentional misconduct/failure to produce test" pursuant to which "dismissal is only appropriate in instances where the conduct is intentional or the prosecution fails completely to deliver the required materials." The issue is not whether prosecutorial misconduct in complying with its discovery obli-

gations should be overlooked by the trial court—it never should be—but whether and when dismissal of all criminal charges (instead of some lesser sanction) should be the appropriate remedy for such misconduct. All we are saying is that, except in cases like *State v. Quintal*, 479 A.2d 117 (R.I.1984), where the state persists in violating a prior court order or in other extreme circumstances not present here, a trial justice should not be throwing out an indictment with the bathwater dirtied by the prosecution's discovery violation(s).

volves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience." *Helvering v. Hallock,* 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604, 612 (1940) (Frankfurter, J.). Largely for the reasons indicated in Part II of Justice Bourcier's dissenting opinion in *DiPrete,* we believe that the use of an abuse-of-discretion standard to review a trial court's sanction rulings for criminal discovery violations is "a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience" than the "no authority" test embraced by the *DiPrete* majority.[9] Accordingly, with respect to *DiPrete*'s "no authority" dicta, "considering how recently the case was decided, very little harm will come from overruling it, and that by doing so we shall *** establish the correct rule." *Allen v. Danielson,* 15 R.I. 480, 482–83, 8 A. 705, 706 (1887) (stated after the Court decided to overrule a recently decided case).

Justice O'Connor of the United States Supreme Court more recently sounded a similar note in the case *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995):

"Remaining true to an 'intrinsically sounder' doctrine established in prior cases better serves the values of stare decisis than would following a more recently decided case inconsistent with the decisions that came before it; the latter course would simply compound the recent error and would likely make the unjustified break from previously established doctrine complete. In such a situation, 'special justification' exists to depart from the recently decided case." *Id.* at 231, 115 S.Ct. at 2115, 132 L.Ed.2d at 184–85.

We also note that our disagreement with the *DiPrete* majority's dicta concerning whether a Superior Court trial justice has the discretion to dismiss an indictment in certain circumstances may be more semantic than substantive. Except for the dissent,[10] all of the justices of this Court concur that in certain egregious circumstances—namely, flagrant prosecutorial discovery noncompliance coupled with substantial resultant prejudice to the defendant that cannot be remedied by alternative measures—Rule 16(i) permits a trial justice to dismiss a criminal indictment both before and after the underlying criminal trial has begun. Conversely, we also agree that a trial justice commits reversible error by dismissing an indictment for the prosecution's discovery violations in the absence of such egregious circumstances. In any event, because we conclude that the second trial justice in this case, like the motion justice in *DiPrete,* committed reversible error when she dismissed the indictment in the absence of the requisite showing of substantial prejudice to the defendant, the principle of *stare decisis* vis-à-vis the narrow holding of the *DiPrete* case is not dishonored here.

Finally, we would simply observe in passing that we are less hesitant in this case than we might otherwise be in departing from even the dicta of such a recently decided case when, as here, it would appear that four of the five sitting justices of this Court—both then and now—are not in accord with the

9. In addition to its venerable tenure in Rhode Island as the appropriate standard for appellate review of trial court discovery sanction rulings, the abuse-of-discretion test has also long been employed by the federal courts for the same purpose. *See State v. Coelho,* 454 A.2d 241, 244 (R.I.1982) (Rule 16 based largely on federal counterpart); *see generally* 25 *Moore's Federal Practice* § 616.02[4][e], at 616–28 (3d ed.1998) (citations omitted). Thus, to borrow Mr. Justice Jackson's dictum in *Western Pacific Railroad Corp. v. Western Pacific Railroad Co.,* 345 U.S. 247, 73 S.Ct. 656, 97 L.Ed. 986 (1953) (Jackson, J., dissenting), it would appear that *DiPrete*'s "no authority" rule as applied to a trial court's dismissal of the criminal charges for prosecutorial discovery violations stands alone and "is so unique that it is without precedent and is likely to be without progeny." *Id.* at 275, 73 S.Ct. at 670, 97 L.Ed. at 1003.

10. The dissent subscribes to the view that "Rule 16 should be used not only to remedy the prejudice resulting from a party's nondisclosure but also as a prophylactic measure to deter future misconduct." Although we agree that deterrence of future prosecutorial misconduct is certainly one of the purposes for granting a Rule 16 motion for sanctions in response to the state's discovery noncompliance, in this case the mere gratification of deterrence objectives in response to the prosecution's nondeliberate violation of its discovery obligations was insufficient to warrant the ultimate penalty of dismissing the criminal charges.

statements in question. In this regard, it is important to recall that the *DiPrete* majority was composed of the Chief Justice and two retired justices of this Court who had been designated to sit on that case by the Chief Justice pursuant to his statutory power to assign such duties to retired justices. *See* G.L.1956 § 8–3–8(c). Because two of the five active justices on this Court recused themselves from participation in the *DiPrete* decision and because the other two active judges of the Court dissented from the "no authority" portion of the majority's opinion, the Chief Justice was the only one of this Court's then active judges who joined this aspect of the majority's opinion in *DiPrete*. Accordingly, as is evident from the opinions in this case, four of the five active judges of this Court when *DiPrete* was decided are of the opinion that the "abuse of discretion" standard is the proper one to use in reviewing a Superior Court justice's decision to impose sanctions for the prosecution's discovery noncompliance—even when dismissal of an indictment is the sanction selected. In these unusual (if not unique) circumstances, we believe that our freedom to disagree with the dicta of such a recently decided case of this Court is greater than it otherwise would be in the usual course.

Nonetheless we totally agree with the concurring opinion's appraisal of the splendid and exemplary service rendered to this Court by its retired justices. And we acknowledge, as does the concurring opinion, their combined sixty years of trial and appellate judicial experience. Remarkably, however, neither the concurring justice nor the retired justices during their combined one-hundred-plus years of outstanding judicial service had ever before espoused the "no authority" rule that they articulated for the first time in *DiPrete*. And all of these justices were members of the Court when it issued its unanimous unpublished order in *Rawlinson*

that acknowledged the "ample authority" of the trial justice to dismiss an indictment under the egregious circumstances presented by the prosecution's discovery violations in that case. In fact, retired Justices Shea[11] and Murray[12] had authored more than several of the milestone and unanimous opinions of this Court that firmly set out and established the abuse-of-discretion standard of appellate review for Rule 16 discovery violation sanctions imposed by a trial justice. Moreover, as late as 1997 and until *DiPrete*, the author of the concurring opinion had also consistently adhered to the abuse-of-discretion standard in reviewing sanctions for Rule 16 violations.[13] This is the standard to which we now return as we reinstate it in this opinion.

## III

### Double Jeopardy

██ Musumeci also claims that a retrial would violate his right not to be placed in double jeopardy for the same offenses. The general rule is that the double-jeopardy bar does not preclude a second trial when a defendant requests a mistrial. Nonetheless, in *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the United States Supreme Court recognized a narrow exception to this general rule, concluding that intentional goading by the prosecution designed to induce a defendant to seek a mistrial would preclude on double-jeopardy grounds the otherwise allowable retrial of the defendant. *Id.* at 673, 102 S.Ct. at 2088, 72 L.Ed.2d at 423. We recently reaffirmed the incorporation of the *Oregon v. Kennedy* standard into our state constitutional jurisprudence in *State v. McIntyre*, 671 A.2d 806, 807 (R.I.1996). *See also State v. Diaz*, 521 A.2d 129, 133 (R.I.1987) (reviewing Rhode Island double-jeopardy jurisprudence). In *McIntyre*, however, we expressly declined an invitation to expand the exception to encompass

11. *See State v. Squillante*, 622 A.2d 474, 478 (R.I.1993); *State v. Engram*, 479 A.2d 716, 718–19 (R.I.1984); *State v. Verlaque*, 465 A.2d 207, 213 (R.I.1983); *State v. Concannon*, 457 A.2d 1350, 1353 (R.I.1983).

12. *See State v. Evans*, 668 A.2d 1256, 1259 (R.I. 1996); *State v. Ramos*, 553 A.2d 1059, 1068 (R.I.1989); *State v. Lawrence*, 492 A.2d 147, 149

(R.I.1985); *State v. Quintal*, 479 A.2d 117, 119 (R.I.1984); *State v. Sciarra*, 448 A.2d 1215, 1218 (R.I.1982).

13. *See State v. Gomes*, 690 A.2d 310, 319 (R.I. 1997); *State v. O'Dell*, 576 A.2d 425, 430 (R.I. 1990); *State v. Darcy*, 442 A.2d 900, 902 (R.I. 1982).

prosecutorial misconduct that was reckless yet unintentional. *McIntyre*, 671 A.2d at 807.

Musumeci's double-jeopardy argument is predicated on his assertion that the first trial justice found that the state had goaded the defense into requesting a mistrial. Although the first trial justice did use the word "goaded" at one point during a colloquy between the bench and defense counsel, a review of the entire transcript, while taking that statement in its overall context, does not show that the state goaded defendant into moving to pass the case. As in *Diaz*, "the prosecut[ion] did not intend to bring about a mistrial, even though [its] conduct gave rise to a situation in which a mistrial should properly have been granted." 521 A.2d at 132. Indeed, here as in *Diaz*, "the prosecut[ion] vigorously opposed defendant's motion for a mistrial." *Id*. at 133.

■ As Musumeci concedes, the second trial justice declined to rest her dismissal order on double-jeopardy grounds. Therefore, no evidence below suggests that the prosecution's nonproduction of the officer's daily log was intentional or otherwise designed to wheedle defense counsel into requesting a mistrial. *See State v. Gordon*, 508 A.2d 1339, 1345 (R.I.1986) ("mere prosecutorial error, although it may necessitate a mistrial, will not operate to preclude a retrial"). And our independent review of the record fails to disclose any basis for making such a finding. Without that critical factual predicate, this case does not fall within *Oregon v. Kennedy*'s narrow exception to the general rule that a mistrial declaration requested by the defendant will not bar a second prosecution of a criminal defendant.

### Conclusion

For the reasons discussed above, we sustain the state's appeal, vacate the Superior Court order dismissing the information, and remand this case to the Superior Court for trial.

WEISBERGER, Chief Justice concurring in part and dissenting in part.

I agree with the majority that the second trial justice acted improperly in purporting to dismiss an information in the circumstances of this case which are clearly set forth in the majority opinion.

However, I respectfully disagree that the second trial justice had discretionary power to dismiss the information and that her decision to do so should be reviewed under the deferential abuse of discretion standard.

For the reasons set forth in *State v. DiPrete*, 710 A.2d 1266 (R.I.1998), I contend emphatically that Rule 16 of the Superior Court Rules of Criminal Procedure, neither explicitly nor implicitly confers upon a justice of the Superior Court discretion to dismiss an information or indictment save under the most extraordinary and compelling circumstances. A majority of the Court held in *DiPrete* that a justice of the Superior Court exceeded his authority in dismissing twenty-two counts of an indictment because of delayed discovery. *Id*. at 1267. The Court issued this decision even though the justice had found as a fact that the delayed disclosure was deliberate. *Id*. at 1270. We pointed out that in no case save *State v. Quintal*, 479 A.2d 117 (R.I.1984), had this Court ever approved the dismissal of an indictment for a discovery violation. *DiPrete*, 710 A.2d at 1271–72. We also observed that in *Quintal* a justice of the Superior Court had entered a conditional sixty-day order specifying that if the state failed to comply with the court's discovery command, the case would be automatically dismissed with prejudice. We emphasized that the state had agreed to the entry of this conditional order of dismissal. *Id*. at 1272–73. The exact language of the opinion in *Quintal* was as follows:

"A conditional sixty-day order was entered specifying that if the state failed to comply with the court's command, the case would automatically be dismissed with prejudice. This was agreed upon by defense counsel and the representative from the Office of the Attorney General, and the order was entered on November 30, 1982, setting January 24, 1983, as the deadline for compliance." *Quintal*, 479 A.2d at 118.

Consequently, the first time that this Court had been squarely presented with the issue of the propriety of the dismissal of an

indictment in the absence of a conditional order entered by consent was *DiPrete.* The majority confronted this question and answered it without equivocation by holding that in the absence of flagrant misconduct by the state resulting in incurable prejudice to the defendant, a Superior Court justice had no power to dismiss an indictment. *Id.* at 1276. To put it another way, the trial court's discretion to dismiss can only be called into play when the circumstances present the two-prong requirement of flagrant misconduct and incurable prejudice. The existence or nonexistence of these predicate conditions cannot and should not be reviewed by an appellate court using a deferential abuse of discretion standard. This Court has never so held and from our research it appears that federal courts applying a similar rule of discovery have not so held.

It is true that a dissenting justice in *Di-Prete,* 710 A.2d at 1292, did cite the case of *State v. Rawlinson,* 526 A.2d 1278 (R.I.1987). This Court pointed out that the per curiam opinion in *Rawlinson* had no relevance to the issue of dismissal. An unpublished order of remand did not present the question of the propriety of dismissal in an adversarial context. *DiPrete,* 710 A.2d at 1274 n. 3. Consequently, *DiPrete* is the sole prior opinion of this Court that squarely deals with the issue of dismissal of an indictment for a discovery violation. A minimal respect for the doctrine of *stare decisis* would require that this Court be guided by that opinion. The mere fact that the present majority of this Court did not either concur or participate in that opinion does not vitiate the doctrine of *stare decisis.* All members of this Court are bound by its prior decisions regardless of whether they were members of the Court who participated or even dissented in respect to prior opinions.

Probably the greatest judicial craftsman of the mid-twentieth century was Justice John Marshall Harlan of the Supreme Court of the United States. His respect for *stare decisis* is illustrated by the fact that after dissenting from such major opinions as *Benton v. Maryland,* 395 U.S. 784, 801, 89 S.Ct. 2056, 2066, 23 L.Ed.2d 707, 719 (1969) (making the ban on double jeopardy applicable to the states);

*Miranda v. Arizona,* 384 U.S. 436, 504, 86 S.Ct. 1602, 1643, 16 L.Ed.2d 694, 740 (1966) (setting standards for in-custodial interrogation); and *Malloy v. Hogan,* 378 U.S. 1, 14, 84 S.Ct. 1489, 1497, 12 L.Ed.2d 653, 663 (1964) (making Fifth Amendment privilege against self-incrimination applicable to the states), he went on in later opinions to concur with the majority of the Court on the ground that the prior opinions from which he dissented had become the law of the land. *See, e.g., Ashe v. Swenson,* 397 U.S. 436, 448, 90 S.Ct. 1189, 1196, 25 L.Ed.2d 469, 478 (1970) (Harlan, J. concurring) (following the mandate announced in *Benton v. Maryland,* which had overruled Justice Harlan's majority opinion in *Hoag v. New Jersey,* 356 U.S. 464, 78 S.Ct. 829, 2 L.Ed.2d 913 (1958)); *North Carolina v. Pearce,* 395 U.S. 711, 744, 89 S.Ct. 2072, 2085, 23 L.Ed.2d 656, 680 (1969) (Harlan, J. concurring in part and dissenting in part); *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106, 110 (1965) (Harlan, J. concurring). Although he dissented in the first instance, he recognized that the opinions of the majority in these cases were binding and should govern future decisions of the Court. He thus contributed to the stability and predictability that this doctrine provides. A tribunal that shifts its position every few months may satisfy the individual predilections of its members, but in the long run will diminish its credibility. An outstanding characteristic of Justice Harlan's judicial career was that he no longer questioned the holding of the majority after an opinion had been rendered even though he saw fit to dissent. Justice Harlan's example is worthy of emulation.

Another great judicial craftsman, Supreme Court Justice Lewis F. Powell, Jr., commented on *stare decisis* and judicial restraint in the following terms:

"Perhaps the most important and familiar argument for *stare decisis* is one of public legitimacy. The respect given the Court by the public and by the other branches of government rests in large part on the knowledge that the Court is not composed of unelected judges free to write their policy views into law. Rather, the Court is a body vested with the duty to exercise the judicial power prescribed by the Constitu-

tion. An important aspect of this is the respect that the Court shows for its own previous opinions." Lewis F. Powell, Jr., *Stare Decisis and Judicial Restraint,* 1991 Journal of Supreme Court History 13, 16.

Underlying our opinion in *DiPrete* was a rationale based upon enormously important policy considerations. The dismissal of an indictment or an information for a discovery violation is a drastic step. Both the majority and the dissent in this case would recognize that dismissal of an indictment or an information should take place only as a last resort to save a defendant from incurable prejudice brought about by egregious prosecutorial misconduct. Reviewing such an action by the deferential standard of abuse of discretion is inadequate. If this Court is to establish clear and definitive standards for the trial courts of our state, we must insist upon uniformity, particularly in respect to the vitally significant question of the propriety of the dismissal of a criminal indictment or information.

The Supreme Court of the United States in order to achieve uniformity in determining the correctness of holdings relating to probable cause and reasonable suspicion has determined that such findings should be reviewed de novo and not by the deferential standard of clear error. *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996). The Court had previously held that the voluntariness of a confession should be reviewed de novo as a mixed question of law and fact and not by a clearly erroneous standard even in habeas corpus petitions. *Miller v. Fenton,* 474 U.S. 104, 111–12, 106 S.Ct. 445, 450–51, 88 L.Ed.2d 405, 411–12 (1985).

Certainly uniformity in enforcement of such a drastic remedy as dismissal of an indictment or information is equally essential as the establishment of standards for determining reasonable suspicion, probable cause, and voluntariness. It must be remembered that a practical definition of discretion without legalism is the right to be wrong without being reversed. I recognize that there are varying degrees of discretion as we set forth in *Albertson v. Leca,* 447 A.2d 383 (R.I.1982). In that case we noted that there are two broad categories of discretion. "The first

category of discretion accords to judges freedom of choice unhampered by legal rules. For example, a decision to recess court or to grant a continuance in a case would not normally be reviewable by an appellate court. The second class of judicial discretion involves freedom of choice, but the choices are limited, bounded by law, and reviewable." *Id.* at 387.

Nevertheless, even the second category which would include admission and exclusion of evidence on the ground of relevance gives considerable freedom of choice. I believe that this freedom of choice is inappropriate in the context of dismissal of an indictment. We cannot have such a question measured by the legendary length of the chancellor's foot. *See Gee v. Pritchard,* 2 Swans. 403, 414, 36 Eng.Rep. 670, 674 (1818); 1 J. Story, *Commentaries on Equity Jurisprudence* 16 (13th ed. 1886) (citing Selden's Table Talk, title "Equity;" 3 Black. Comm. 432, note (*y* )). Consequently, the establishment of a predicate upon which dismissal of an indictment or information may be based should be reviewed as a mixed question of law and fact de novo by this Court and not under an abuse of discretion standard. It would be unconscionable as in the present case for one justice of the Superior Court to deny a motion to dismiss a criminal case and another justice of the same court allowed to grant it unhampered save for deferential review based upon abuse of discretion. It is the function of this Court to set and maintain standards, not to foster the potential chaos of inconsistent determinations subject only to correction if an abuse of discretion may be found to have existed.

The majority suggests that the square holding in *DiPrete* was dictum. I am convinced that the definition of "obiter dictum" does not fit the determination of the majority in *DiPrete* that the trial justice had exceeded his authority in dismissing twenty-two counts of an indictment. This was a case of first impression in which the issue of the authority of a justice of the Superior Court to dismiss an indictment was presented in an adversarial context for the first time in this jurisdiction.

"Obiter dictum" has been defined in Black's Law Dictionary as

"[A]n observation or remark made by a judge in pronouncing an opinion upon a cause *** or the solution of a question suggested by the case at bar, but not necessarily involved in the case or essential to its determination ***." Black's Law Dictionary 454 (6th ed.1990).

In *DiPrete* the holding of the majority was clear and specific. A trial justice does not have the authority to dismiss an indictment in the absence of having made two predicate findings: (1) flagrant prosecutorial misconduct, (2) incurable prejudice. Whether the majority in this case agrees or disagrees with that holding, it would be hard to say that it was not essential to the judgment in *DiPrete*.

An analysis of the majority's assertion respecting dictum would probably lead one to conclude that its real thrust would assert that the *DiPrete* majority could have reached the same result by another route. It is, of course, conceivable that the majority might have made the same determination under an abuse of discretion standard. This, however, is not a definition of *obiter dictum*. In fact, Justice Harlan in a dissenting opinion in *Lee v. Madigan*, 358 U.S. 228, 237, 79 S.Ct. 276, 282, 3 L.Ed.2d 260, 267 (1959), made a pertinent observation concerning a similar suggestion:

"The idea that the ground on which a court actually decides a case becomes dictum because the case might have been decided on another ground is novel doctrine to me."

One of the more frequently cited illustrations of *obiter dictum* is that portion of the opinion by Chief Justice John Marshall in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), in which he discussed extensively substantial issues in respect to the merits of a petition for mandamus prior to holding as a matter of law that the Su-

preme Court had no jurisdiction to entertain the petition and that the section of the Federal Judiciary Act of 1789 which purported to grant such jurisdiction was constitutionally invalid. The opinion of the majority of this Court in *DiPrete* certainly did not meet the definition of *obiter dictum*.

The majority, in a textbook example of *obiter dictum*, also suggests that it was significant that two members of the majority in *DiPrete* were retired justices, as though that fact somehow diminishes the precedential value of the opinion. I would point out that the two retired justices who participated in that case had a combined background of more than sixty years of judicial experience, both trial and appellate. Their familiarity with Rule 16 of the Superior Court Rules of Criminal Procedure and the Rhode Island cases which were enunciated subsequent to its adoption was comprehensive and lucid.[14] A retired justice who is called into service has all the powers of an active judge. His or her status is not dissimilar to the senior judges of the United States Courts of Appeals. The late Chief Justice Burger of the Supreme Court of the United States observed in a year-end report on the judiciary that, "[s]enior (semi-retired) federal judges, who literally 'work for nothing,' annually contribute the equivalent work of about 70 full-time, active judges. Without the work of the Senior Judges the federal judicial system would have foundered." Warren E. Burger, *1985 Year–End Report on the Judiciary*, 4.

I agree with the majority that the doctrine of *stare decisis* is not an inexorable command, but it is an important element in buttressing the legitimacy of a court's opinions. I also emphasize that the dismissal of an indictment or an information is so drastic a sanction that it should not be reviewed by the most deferential standard of abuse of discretion. The instant case demonstrates eloquently that two trial justices may come

14. The majority suggests that both the retired justices and the Chief Justice had authored a number of opinions recognizing the abuse of discretion standard. *See* footnotes 11, 12, and 13 to the majority opinion. It should be noted that none of the opinions cited in these footnotes involve the dismissal of an indictment. I recognize that the abuse of discretion standard has been utilized in reviewing the granting or denial of a mistrial, the granting or denial of a new trial, and the determination of whether to impose the sanction of exclusion of evidence. I reiterate my position that the ultimate sanction of dismissal of an indictment or an information should be reviewed de novo.

to opposite conclusions on the same set of facts. It would be wholly inappropriate in a somewhat closer case to determine that although this Court disagreed with the holding of one of the judges, it would be precluded from correcting the error because of inhibitions imposed by the standard of review. As stated earlier in this opinion, the Supreme Court of the United States now demands uniformity in determinations of probable cause, reasonable suspicion, and voluntariness of confession. *See Ornelas,* 517 U.S. at 699, 116 S.Ct. at 1663, 134 L.Ed.2d at 920 (probable cause; reasonable suspicion); *Miller v. Fenton,* 474 U.S. at 111–12, 106 S.Ct. at 450–51, 88 L.Ed.2d at 411–12 (voluntariness of confession). Uniformity is at least as important in setting the predicate standards for dismissal of an indictment or an information.

The dissenting justice in *DiPrete* clearly illustrated the standard of review which he applied.

> "That was clearly his [the trial justice's] discretionary judgment call to make, and while the majority may disagree with that choice of sanction, mere disagreement can not translate itself into a holding that the trial justice clearly abused his discretion. This Court should not second guess the trial justice on what is a discretionary judgment call simply because the majority might have made a different call. Unless this Court can say that the trial justice clearly abused his discretion, we should not disturb his action." *DiPrete,* 710 A.2d at 1282.

I cannot subscribe to such a standard of review that would abdicate this Court's appellate supervision of the dismissal of an indictment or an information. Only de novo review on the basis of the correctness of predicate findings will guarantee the essential element of uniformity in this area of paramount significance.

I agree with the majority that even under the deferential standard it applies, the second trial justice did abuse her discretion. However, I would have followed the teachings of *DiPrete* and determined that she exceeded her authority as a matter of law and that the circumstances of this case did not trigger the exercise of discretion on her part to dismiss the information.

For the foregoing reasons, I concur in the result reached by the majority though I depart from portions of their rationale.

GOLDBERG, Justice, concurring in part and dissenting in part.

While I concur with the majority and believe that the appropriate standard of review to be applied in the instant case is an abuse of discretion standard, I respectfully dissent from both the majority's factual analysis and its conclusion that the trial justice abused her discretion. On the contrary, I believe that this learned trial justice applied the proper criteria and pursuant to the authority granted to her by well-established rules of criminal procedure appropriately selected dismissal as a remedial sanction on the ground of grossly negligent prosecutorial misconduct.

Beginning with a series of cases, the majority of which were decided over fifteen years ago, Rule 16 of the Superior Court Rules of Criminal Procedure was fleshed out such that the disclosure responsibilities for both sides to a criminal prosecution are now well established. *See State v. Verlaque,* 465 A.2d 207, 213–14 (R.I.1983); *State v. Concannon,* 457 A.2d 1350, 1353–54 (R.I.1983); *State v. Coelho,* 454 A.2d 241, 244–45 (R.I.1982); *State v. Sciarra,* 448 A.2d 1215, 1218–19 (R.I. 1982); *State v. Darcy,* 442 A.2d 900, 902–03 (R.I.1982); *State v. Silva,* 118 R.I. 408, 411, 374 A.2d 106, 108 (1977). Indeed, the jurisprudence surrounding Rule 16, its meaning, and its significance have a long history in this Court to the point where its "wide acceptance has become part of the context in which a trial is conducted." *Darcy,* 442 A.2d at 903.

> "An attorney who expects, by reason of reliance upon the rules, that honest, accurate, and complete answers will be given in response to discovery requests can scarcely be effective if his expectations are wholly shattered in the course of a trial. His reaction will be one of surprise and occasionally consternation. \*\*\* The requirements of due process and of effective assistance of counsel must be evaluated and defined within the context of a trial con-

ducted in accordance with rules of procedure and discovery which are in effect in a particular jurisdiction. We do not suggest that any deviation from discovery requirements, however slight, will constitute a violation of due process and effective assistance of counsel. However, when the failure of discovery results in complete surprise on a crucial issue, then we believe that due process and effective assistance of counsel will be impacted." *Id.*

As a result the criminal bar has been at relative peace with respect to its discovery obligations and the need to impose sanctions for violations thereof. The lessons have been well taught, albeit painfully, to prior generations of prosecutors and defense counsel such that the need to impose sanctions for various discovery violations has been greatly diminished.

Nevertheless this Court has had ample opportunity to review and discuss the appropriateness of sanctions for failure of either party to fulfill their discovery obligations pursuant to Rule 16. We have consistently stated, as the majority acknowledges, that while subsection (i) of Rule 16 provides a list of specific sanctions to employ in the event of noncompliance, the trial justice is clearly free within the bounds of sound discretion to impose any sanction he or she deems appropriate in light of the attendant circumstances. *See State v. Quintal*, 479 A.2d 117, 119 (R.I. 1984); *Silva*, 118 R.I. at 411, 374 A.2d at 108; *see also Darcy*, 442 A.2d at 902 ("[t]he phrase 'such other order as it deems appropriate' makes the declaration of a mistrial an appropriate sanction"). Because the trial justice is unquestionably in the best position to evaluate the case and determine what sanction would be most suitable, we will not, and should not, disturb his or her action in this regard absent a clear abuse of discretion. *See State v. Brisson*, 619 A.2d 1099, 1102 (R.I.1993); *Coelho*, 454 A.2d at 244–45.

*But see State v. DiPrete*, 710 A.2d 1266, 1274 (R.I.1998) (no authority to impose sanction of dismissal).

Yet in spite of this deferential standard of review, heretofore applied even in the face of dismissal of the charges, the majority concludes that the second trial justice abused her discretion in administering the sanction of dismissal. The majority cites *DiPrete* and *Quintal* as the only two reported case in which this Court has specifically considered the merits of a Superior Court dismissal sanction for a Rule 16 discovery violation.[15] The majority further notes that only in *Quintal* did we affirm the imposition of the sanction of dismissal, and only then after the state's repeated failure to produce the requested discovery notwithstanding the trial court's entry of a conditional dismissal order providing for this disposition if the material was not produced by a date certain. I nevertheless believe that the rarity with which the sanction of dismissal is imposed in no way affects the appropriateness of its application but rather it reflects the care and deliberation with which the imposition of such a sanction is approached.

It should be noted that *Quintal*, as well as *State v. Rawlinson*, 526 A.2d 1278 (R.I.1987), represent the watershed of the state's chronic failure to make timely discovery before trial. A judge-made compliance tool, *Quintal's* self-executing order of dismissal was developed and employed by the trial court as a last-ditch effort to force the state's compliance. It worked. Accordingly the fact that over ten years passed before this Court again had the opportunity, or misfortune as the case may be, to review a case in which dismissal had been ordered in response to the state's failure to comply with its discovery obligations is of little or no surprise. Furthermore, the fact that there is a paucity of cases addressing the issue of dismissal

---

**15.** The majority cites *State v. Rawlinson*, 526 A.2d 1278 (R.I.1987) but nevertheless maintains that to date *State v. DiPrete* 710 A.2d 1266 (R.I. 1998) and *State v. Quintal*, 479 A.2d 117 (R.I. 1984) remain the only reported cases in which we have specifically considered the appropriateness of such a sanction. *But see DiPrete*, 710 A.2d at 1292–93 (Bourcier, J. dissenting). I find it unnecessary to join in this debate, however,

because whether it is two prior reported cases or it is three, I standby my conclusion that a trial justice is clearly free within the bounds of sound discretion to impose a dismissal order as a remedial sanction for grievous discovery violations. I do not believe that the dearth of cases concerning the imposition of the sanction of dismissal undermines the appropriateness of its application in this context.

resulting from prosecutorial misconduct in no way undermines the authority of the trial court, as afforded by Rule 16, to apply this sanction as a remedy for a "very grievous" discovery violation. *See DiPrete*, 710 A.2d at 1292 (Bourcier, J. dissenting) (proper judicial response is not dependent upon the existence of past precedent). On the contrary, it is my opinion that the second trial justice in this case followed well-established procedure, conducted a careful and thorough analysis of the facts, applied the *Coelho* criteria, and determined that dismissal was warranted. On the basis of facts of this case, I can discern no error in her decision to do so.

The second trial justice found, and the record reveals, that the nondisclosure was directly attributable to the prosecutor's inadequate and indeed grossly negligent preparation of the case. This investigation was conducted over a six-month period and involved not only Musumeci but several other employees of the North Providence Department of Public Works. This fact alone ought to have alerted the prosecutor to the existence of the log in question and at least the possibility of hand written notes. This prosecutor, however, spent merely one hour with the state's chief witness, the investigating officer, Paul E. Rodrigues (Rodrigues), one week before the trial and at no point inquired whether the witness possessed any other statements, reports, or notes that might be relevant to the case. Furthermore Rodrigues was not "an undercover police officer" as the majority asserts but rather an applicant for a law enforcement position with the North Providence police department who in the hopes of being hired for a full-time patrolmen's position accepted an offer to participate in the investigation. This is a significant distinction in two respects. First, this "officer" had absolutely no prior training, which may very well lend support to the entrapment defense planned by Musumeci's counsel. Moreover this witness, while not a paid police informant, certainly had a vested interest in the success of the investigation. As the second trial justice observed, even elemental preparation in the instant case would have avoided the necessity of a mistrial.

The trial justice next addressed the specific prejudice suffered by Musumeci noting that common sense would dictate that if the log contained potentially exculpating evidence, that potential existed to a far greater degree at the time Musumeci received the information package in October of 1993 than it did in March of 1995, the time when Musumeci finally received the log. She also spoke in a more general sense of the prejudice inherent in retrying a case, noting the social, economic, and emotional burden of a second trial on an accused. The record discloses that Musumeci, an eight-year employee of the department of public works, had never before been arrested. As a direct result of the prosecutor's grossly negligent conduct, conduct which I note was the source of grave concern to two experienced trial justices, this first time offender was forced to accept a mistrial and was required to undergo the financial and emotional hardship of another trial.

More importantly, the trial justice found a total failure on the part of the prosecution to accept any responsibility for its failure to provide the defense with the required information or to recognize the severity of its violation. When initially confronted with the existence of the log, the prosecutor denied that his failure to include it in the information package constituted a violation of Rule 16, insisting instead that the log constituted work-product. The state further asserted that the information contained in the log had been provided to the defense as part of the witness statement summary and that therefore there was no harm or prejudice suffered by Musumeci. It is doubtless that this stonewalling and this refusal to admit any culpability with respect to a clear failure to turn over discoverable material contributed significantly to the second trial justice's decision. The second trial justice stated that our system of jurisprudence is designed to ensure a "trial by jury, not trial by ambush" and concluded that the only way to ensure that such gross negligence was not repeated was to dismiss the case. I agree.

The majority maintains, however, that on the facts of this case, the second trial justice abused her discretion "in deciding to admin-

ister the extreme sanction of dismissal." In so holding, the majority attempts to distinguish the dismissal in this case from the dismissal in *Quintal*, and simultaneously liken it to the dismissal in *DiPrete*, by focusing on the deliberate and persistent nature of the misconduct involved. The majority states that while the prosecution in *Quintal* "continued to deny the defendant any opportunity to examine the requested discovery materials or to avail himself of the potential advantages that may have flowed from doing so" here the nondisclosure was unintentional and, like the scenario presented in *DiPrete*, ultimately remedied. The majority opines that by virtue of the log's production and the ten month interim between the mistrial and the scheduled commencement of the second trial, Musumeci was afforded a sufficient remedy to any alleged prejudice and therefore dismissal was inappropriate. The inference to be drawn from this conclusion is that dismissal is only appropriate in instances where the conduct is intentional or the prosecution fails completely to deliver the required materials.

The adoption of this bright-line test, however, is of little assistance to the bench and bar. This Court has always drawn a distinction between intentional and unintentional nondisclosure and has consistently held that proof of prejudice is unnecessary where there has been intentional and deliberate nondisclosure. *See State v. Wyche*, 518 A.2d 907, 910 (R.I.1986); *Verlaque*, 465 A.2d at 214; *Concannon*, 457 A.2d at 1353–54; *In re Ouimette*, 115 R.I. 169, 174–75, 342 A.2d 250, 252–53 (1975). We have recognized, however, the difficulty associated with establishing intentional and deliberate nondisclosure and have expressed our concerns about the prosecutor's "good-faith intentions to comply with the spirit, if not the letter, of Rule 16." *Coelho*, 454 A.2d at 245; *see also Darcy*, 442 A.2d at 903 ("it would be unfair to allow the state the tactical advantage of surprise gained by violating, whether intentionally or unintentionally, the rules of discovery").

Thus, I can see no purpose to be served by adopting the majority's intentional misconduct/failure to produce test.

Furthermore, while the majority acknowledges that the second trial justice was "justifiably concerned about the potential staleness of the evidentiary leads belatedly revealed in the log" it states that Musumeci should have or was required to provide additional evidence of actual prejudice. The majority intimates that had Musumeci presented the second trial justice "with an expanded evidentiary record different from the one that the first trial justice had faced" a more compelling case for dismissal would have been made.

The record reveals, however, that the first and only evidentiary hearing held on the motion to dismiss was conducted by the second trial justice. For the first time, the trial court was presented with evidence about the specific contents of the log. Rodrigues had made entries every day for the six-month period he conducted his investigation, entries that related to not only Musumeci but all the individuals under investigation. This potentially exculpatory information, which would most certainly have prompted additional investigation by the defense, included names and dates not previously provided by the Attorney General's office or covered in Rodrigues' witness statement. The nature and full extent of the violation and the gross lack of even elemental preparation was disclosed for the first time before the second trial justice; it was not a rehash of the earlier midtrial proceedings that culminated in a mistrial. Therefore I believe the trial justice was well within her authority to entertain Musumeci's motion to dismiss.[16]

In a similar vein, the majority further concludes, erroneously in my view, that the first trial justice had "already decided that dismissal was too severe a sanction." On the contrary, I believe the first trial justice left the door wide open for further discussion on the appropriateness of the sanction. It is

---

16. If the conclusion of the majority that the second trial justice abused her discretion rests primarily upon the extreme nature of the sanction and the failure of Musumeci to produce evidence of additional prejudice, a requirement not previously articulated by this Court, then I would respectfully suggest that the case be remanded for an evidentiary hearing where Musumeci is given an opportunity to produce this evidence of additional prejudice and the trial court is given the opportunity to impose more appropriate sanctions.

important to note that the first trial justice was confronted with the nondisclosure in the middle of trial and chose to deny the motion to dismiss at that time. The trial justice stated, however, that he found that the state had acted in such a manner as to "goad" Musumeci into moving for a mistrial. Contrary to the majority's assertion, Musumeci clearly did not "request" a mistrial but was in fact reluctant to do so. A fair reading of this record supports the conclusion that Musumeci had no other option available to him and that the first trial justice, and indeed both parties, fully expected this matter to be litigated at an appropriate time.

> "Oh, I know it and I have considered that. I have considered it. It's not such I feel I can on my own dismiss it. *If somebody is reading it later on somebody else might dismiss it,* I don't know, but as of now I granted the motion for a mistrial. We got [*sic*] a tainted jury here now." (Emphasis added.)

Accordingly, I disagree with the conclusion of the majority that the motion was either renewed some ten months after the fact or that the law-of-the-case doctrine "should have at least presumptively barred any reexamination of this initial ruling." The motion to dismiss the information was filed the day after the mistrial was granted. This motion to dismiss, and an evidentiary hearing thereon, were clearly anticipated by both the first trial justice and by counsel. Indeed the record discloses that this motion was placed on the daily criminal calendar for hearing and was continued three times before counsel for both sides agreed it would be heard immediately prior to trial. Moreover, the state never raised the issue of law of the case or res judicata at any time in the Superior Court

and only raised these issues for the first time on appeal. Therefore, these issue are beyond our scope of review. *See State v. Snow,* 670 A.2d 239, 245 (R.I.1996).

Finally, and the point upon which I find myself at the greatest odds with the majority is its response to the second trial justice's stated intention to send a message to the state's prosecutors that such future discovery misconduct will not be tolerated. The majority concedes that the second trial justice was justified in her anger over the state's "inexcusable lack of preparation and its unwillingness *** to acknowledge fully the consequences and impropriety of its actions in failing to discover and to produce the log in a timely fashion," but nonetheless concludes that "a criminal defendant should not 'go free because the constable [or the prosecution] has blundered.' "[17] The majority opines that the burden of any dismissal action falls squarely on the people of this state and not solely upon the Attorney General's office. I would suggest, however, that even more burdensome to the citizens of Rhode Island and our system of jurisprudence is the prosecuting arm of government adopting a caviler attitude towards and a reckless disregard for rules implemented to ensure the fair and efficient administration of criminal justice. *See DiPrete,* 710 A.2d at 1283–84 (Bourcier, J., dissenting) (failure of state's prosecutors to respond candidly to Rule 16 discovery obligations serves to erode confidence in the criminal justice system); *Concannon,* 457 A.2d at 1353 (prosecutor or defendant who does comply with the rules of discovery undermines the judicial process).

This case did not involve a prosecutor who while diligent in the discharge of his duties

---

**17.** The majority cites *People v. Defore,* 242 N.Y. 13, 150 N.E. 585, 587 (1926) (Cardozo, J.), as support for its pronouncement that weightier policy considerations dictate that we overlook gross negligence by the prosecution if it means a criminal defendant will "go free." I suggest that this is not the policy of the State of Rhode Island. Justice Cardozo's famous quote in *Defore* was made in conjunction with the decision from the State of New York to reject the application of the exclusionary rule promulgated in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Rhode Island's own experience with the *Weeks* rule belies the majority's reliance on *Defore.* In a swift and sure response to this Court's refusal to adopt an exclusionary rule as a matter of state constitutional law for violations of article I, section 6, of the Rhode Island Constitution, *see State v. Olynik,* 83 R.I. 31, 113 A.2d 123 (1955), the General Assembly enacted G.L.1956 § 9–19–25. This section, which prohibits the introduction of illegally seized evidence, was adopted a mere six weeks after *Olynik,* and a full six years before *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Time and the wisdom of hindsight have demonstrated the need for the adoption of this and other prophylactic measures by the nation's courts.

learned of the nondisclosure of discoverable material and then immediately sought to rectify the situation. On the contrary, this prosecutor, admitting he had not previously seen the material contained in the log, nonetheless stated that it was "work-product" to which Musumeci was not entitled. The prosecutor then changed course and argued that the state had not violated Rule 16 because the information contained in the log was a verbatim duplicate of Rodrigues' statement that had been provided to the defense. The state then insisted that the log contained information concerning other investigations and that such information was irrelevant to Musumeci's case. This prosecutor went so far as to make the incredible statement that since the log corresponded with Rodrigues' witness statement, the police must have determined that the statement was sufficient. This response indicates not only a failure to appreciate the seriousness of the violation but also a total misunderstanding of the prosecutor's discovery obligations. *See Verlaque*, 465 A.2d at 214 (prosecutor does not have authority to interpret discovery rules and decide what constitutes substantial compliance or equivalent compliance).

I respectfully suggest that it was this refusal to accept responsibility, as well as the state's insistence that little or no prejudice befell Musumeci because he ultimately received the material, that was the driving force behind the dismissal by this seasoned trial justice. Indeed, more troubling than the prosecutor's grossly inadequate preparation and investigation into the charges against Musumeci is the general and pervasive attitude that the Attorney General's office can disregard the rules of discovery and not be held accountable. Throughout the course of these proceedings, up to and including appeal, the state has asserted the "we did not know about it therefore we are not responsible" defense. This response not only indicates a lack of contrition but also fails to inspire confidence that this type of violation will not happen again.

The majority states that "[a]bsent substantial prejudice, *** some other remedy(ies) and/or sanction(s) *** should generally be imposed—at least in the first instance—upon the court's learning of a material discovery violation." I strongly disagree. What sanctions, if any, adequately address the severe findings and grave concerns of this trial justice? What comfort is the payment of attorney's fees or the referral of an offending prosecutor to disciplinary bar counsel to a defendant who is convicted and in jail as a result of prosecutorial misconduct? I respectfully suggest that the majority's pronouncement leaves the trial court without the ability to incite compliance or deter future violations. On the contrary, this case sends a message that parties to a criminal action, the prosecution in particular, have nothing to lose by withholding discoverable material. If an attorney fails to produce material in violation of Rule 16, at the very worst the transgression will be uncovered and a mistrial will be declared. On the other hand, the violation may not be disclosed and the offending party gains an unfair advantage. This "win-win" scenario is hardly the sort of thing this Court should be fostering. *See also DiPrete*, 710 A.2d at 1289 (Bourcier, J. dissenting).

Therefore I am of the opinion that Rule 16 should be used not only to remedy the prejudice resulting from a party's nondisclosure but also as a prophylactic measure to deter future misconduct. *See generally United States v. Kojayan*, 8 F.3d 1315 (9th Cir.1993); *Commonwealth v. Jackson*, 391 Mass. 749, 464 N.E.2d 946 (1984). I view the decision of the second trial justice, made in the context of this case and at this point in our state's history, to be a clarion call for deterrence and restraint. This is a chorus in whose refrain I join.

Accordingly I would deny and dismiss the state's appeal, affirm the order of dismissal entered below, and remand the case to the Superior Court.